NO. 4-01-0485

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

JEFFREY J. STALEY,

Defendant-Appellant.

)

)

)

)

)

)

)

)

Appeal from

Circuit Court of

Livingston County

No. 00CF326

Honorable

Harold J. Frobish,

Judge Presiding.

_________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

In December 2000, the State charged defendant, Jeffrey J. Staley, with possession of a controlled substance 
(less than 15 grams of a sub­stance containing cocaine) (720 ILCS 570/402(c) (West 2000))
.  In February 2001, defendant filed a motion to suppress evidence, and following a March 2001 hearing, the trial court denied it.  In April 2001, the court conducted a bench trial and found defendant guilty of the charged offense.  In June 2001, the court sentenced him to three years in prison. 

Defendant appeals, arguing only that the trial court erred by denying his motion to suppress evidence.  We affirm. 

I. BACKGROUND

The evidence at the March 2001 hearing on defendant's motion to suppress showed the following.  Around 2 a.m. on December 13, 2000, Pontiac police officer James Woolford saw a car, with its engine running, parked outside a local all-night grocery store.  Woolford's suspicion was aroused because the car was parked in the fire lane at the north end of the store, even though the only entrance to the store was at the south end and the temperature was -9◦ F.  After Woolford drove past the car, Officer John Cox radioed Woolford and told Woolford that he had just seen a man (later identified as defendant) quickly enter and leave a house near the grocery store and then get in the parked car.  Woolford knew that many controlled drug buys had taken place at the house, and he had seen people going into the house at odd hours and then leaving after a short period of time.  He also knew that a former resident of the house was in prison for a drug-related offense and that a current resident had been seen in the company of persons who had been the subject of drug investigations.  Due to the suspicious manner in which the car was parked and the fact that the residence was a known location for drug buys, Woolford positioned his squad car so that he could stop the car.  

When the car left the parking lot, Woolford followed it until he observed that the car's rear registration light was out, a traffic violation.  He then ran a computer check on the car's license plate number and found that the car's registration had been suspended.  Woolford pulled the car over, walked up to it, and asked the driver, Amy Roberts, for her driver's license and insurance information.  When she was unable to produce either, Woolford told her to stay in the car while he ran a computer check.  Woolford noticed that defendant, who was in the front passenger seat, was behaving oddly in that he sat in the car facing straight ahead and did not make eye contact with the officers.  Woolford described that behavior as "unusual."

About one or two minutes after Woolford stopped the car, Sergeant Hugh Roop, the shift supervisor, arrived, and a few minutes thereafter, Woolford and Roop discussed their "strategy and what [they] wanted to do."  Woolford told Roop that Woolford believed that reasonable suspicion existed to justify a canine sniff.  Because the use of canines was relatively new, Roop had some questions as to how Woolford used the dog and "how it worked."  Woolford acknowledged that during his discussion with Roop, Woolford said that the officers "should let the odor get in there pretty good."  He explained that if a person with narcotics on his person has been in an area for a short period of time, the dog might not be able to detect the narcotics.  Upon questioning by the trial court, Woolford stated that the traffic stop was not delayed in order to allow the smell of any narcotics to permeate the car.  He explained that "we had decided that at this point in time I was going to write the tickets first before we did anything else.  That way everything would be taken care of once we got to that point."  Woolford further testified that his narcotics-sniffing dog, Lump, was an "aggressive alert dog," meaning that when Lump detects the presence of narcotics, he scratches and occasionally bites the area of detection.    

Woolford then sat in his squad car, wrote out two citations for Roberts (for operating a vehicle with suspended registration and without insurance), returned to her car, and asked her to get in the squad car so that he could issue the citations.  Immediately upon issuing the citations to Roberts, Woolford asked Roberts if the officers could search her car, and she twice consented.  Woolford then told Cox to have defendant get out of the car, and Woolford walked Lump around the car.  Lump alerted to the driver's side interior door handle and the passenger-side interior door panel.  As Woolford walked Lump back to the squad car, Woolford told Cox to "detain [defendant] also."   Upon further questioning by the trial court, Woolford testified that about 18 minutes elapsed from the time he stopped Roberts' car until he issued her the two traffic citations and she consented to a search.  He stated that that was not an unusually long amount of time because Roberts did not have a driver's license and he had to write two citations.  Woolford also stated that during the stop, defendant did not ask if he could leave, and the officers did not order him to remain in the car.  He acknowledged, however, that defendant would not have been allowed to leave had he asked.

Cox testified similarly to Woolford.  In addition, he stated that after Woolford stopped Roberts' car, Cox spoke with defendant, asked to see his driver's license, and ran a computer check, which showed no outstanding warrants.  Cox then stood "off to the right" while Woolford wrote the citations.  Just before Woolford began the canine search, Cox told defendant to get out of the car.  Cox then conducted a pat-down search of defendant, which revealed cigarettes, Rolaids, and other miscellaneous items.  When Woolford instructed Cox to detain defendant, Cox handcuffed defendant and then conducted a more thorough search of defendant's person.  Cox found a small plastic bag containing a "round, chalk-like, white substance" (later determined to be cocaine) in the right coin pocket of defendant's jeans.  Defendant at no time asked Cox if he could leave and walk home.  

Defendant testified that when Cox first approached him while he was sitting in the car, he made eye contact with Cox "from time to time."  After Cox told him to get out of the car, he asked if he could walk home and Cox told him he could not.

The State also introduced into evidence a videotape of the traffic stop.  

Following the hearing, the trial court took the matter under advisement.  Later in March 2001, the court entered a written order denying defendant's motion to suppress evidence and stating, in pertinent part, as follows:

"1.  Notwithstanding that the stop of the vehicle in question was a pretext in order to pursue [defendant], the court finds that the stop was valid because the officer observed the rear license plate was not illuminated and because the license plate registration belonging to [Roberts], was learned by the officer to be suspended.

2.  The court further finds that the consent given by [Roberts] to search her vehicle was a consent validly given, which precipitated the defendant's subsequent exit from the vehicle.  

Specifically, the court finds that the stop occurred at 2:01:25 a.m. and that consent was given by [Roberts] to search the vehicle in an emphatic manner at approximately 2:20:08 a.m.  The court finds that under this evidence, the intervening time of somewhat more than 18 minutes was not unduly long in order to accomplish the stop, make the investigation of the status of [Roberts'] license plates registration, and the actual issuing of the two citations (the issuance of said citations being accomplished contemporaneously with her providing consent to search) and all occurring during quite miserable weather conditions.

Consent having been given, and the defendant being a passenger in a vehicle which would not be driven by the driver from the stop, but rather would be towed [because of the suspended registration], the court finds that the defendant was lawfully directed to exit the vehicle at approximately 2:21:20 a.m.  It is found by the trial court that until such time as the defendant exited, he himself was not detained or seized by the police.  While the police would not have permitted him to leave (as candidly admitted in testimony) the defendant himself did not attempt to leave and no sufficient basis has been demonstrated to show the defendant reasonably believed he was a target of the stop.  Until the defendant's exit from the vehicle, he was simply a passenger in a vehicle stopped for other purposes relating to the driver during an extremely, bitterly cold early morning event at 2:00 a.m.

* * * 

The evidence shows that the canine did a walk around of the vehicle and alerted to both the interior of the driver's side and interior of the passenger's side during a time frame covering 2:22:15 to 2:24:20.  During this time, Officer Cox was then in the process of the 'pat down' search of the defendant.  At 2:24:58, and approximately contemporaneously with the canine's alert, Officer Woolford instructed assisting Officer Cox to 'detain him (defendant) also.'  Upon receiving the instruction of Officer Woolford to detain the defendant, Officer Cox placed cuffs upon the defendant behind his back.  A closer search of the person of the defendant then ensued and in the 'coin pocket' or 'watch pocket' of defendant's jeans, Officer Cox located a small plastic bag containing approximately 1/2 gram of a white substance believed to be rock cocaine.  The court does not find, as the defendant contends, that the defendant at any time asked Officer Cox if he could leave or that the defendant stated that his home was only a short distance away.  

4.  The placement of the defendant in cuffs in these circumstances gives the trial court pause.  The evidence does not demonstrate that the defendant posed an imminent threat to any officer on this occasion.  The cuffs were placed upon the defendant, it appears, solely as the result of Officer Woolford's instruction to Officer Cox to detain the defendant.  Clearly, the defendant was, at that point, seized in a demonstrative manner, and at a time when no offense had been established that would precipitate an arrest.  This confining method of seizure, the trial court concludes, does not necessarily[,] however[,] render invalid an otherwise lawful 
Terry
 stop, where that brief seizure is supported by reasonable suspicion of criminal activity.

5. ***  Immediately upon exiting the car, Officer Cox commenced the pat[-]down search for safety purposes.  While this pat[-]down search was being undertaken, the canine alerted, resulting immediately in the cuffing of the defendant and the more intrusive search finding the item in question upon the person of the defendant.  

Defendant asserts that under the recent Fourth District case of 
People v. Fondia
, [317 Ill. App. 3d 966, 740 N.E.2d 839 (2000),] that Officer Cox lacked authority to search the defendant's watch pocket during this traffic stop.  In the 
Fondia
 case, the Fourth District made clear that its holding was 'limited to the facts of record and turns on the absence of 
any
 indicia of suspicion, particular to the defendant.  Without more, the search of defendant's person was not justified.'  In 
Fondia
, the dog had alerted at the rear seam of the driver's door, prompting the police to require the three occupants to exit and be subjected to a search of their person.  

In the instant case, the trial court finds that there is something more, namely the defendant's very short visit at 2:00 a.m. to a 'known drug house,' his return to a vehicle which was argued by the State to have been unusually parked, and his conduct found by the police to be suspicious.  This in itself would be insufficient[,] in the court's view[,] to search the watch pocket of the defendant.

More importantly, the canine alerted to the interior of the vehicle, and the analysis of the use of the canine in the instant cause presents a far different situation than the record presented of the canine's action in the 
Fondia
 case.  In the 
Fondia
 case, the majority opinion strongly faulted the failure of the police to use the canine to search the defendant's person and appears to have refused to give the canine's alert on the exterior of the vehicle any weight in determining whether the detention was lawful.  It found the record 'totally devoid' of anything that would support speculation that the canine could not be used to make a sniff of the person.  It described speculation that the canine could not be used to make a sniff of the person.  It described speculation by the appellate prosecutor regarding dangers that could be cause[d] by a dog's alert to an individual to be mere musings, pointing out that even the appellate prosecutor conceded at argument that the record contained no such information.

In the instant case, there is testimony from Office[r] Woolford, as the canine officer, that there is what amounts to a risk to the defendant's safety from the canine that would have occurred had the dog been permitted to engage in a sniff of the defendant.  The trial court further in the instant cause spent considerable time watching a video which corroborated that concern.  Specifically, the canine in question was a large German Shepherd who reacted strenuously in pawing at the interior of the driver's door and passenger's door.  It is readily apparent to the trial court that concern for the safety of persons such as the defendant is reasonably founded.  Thus, the record before this trial court is different than the record before the 
Fondia
 court, and it is appropriate that the trial court here give weight to the alerting by the canine to the interior of the vehicle in question.

Taking the totality of the circumstances in question, the court finds that the search of the person of the defendant revealing the drugs in question was constitutional." (Emphasis added.)

In addition, the court stated that the pat-down of defendant immediately after he got out of the car was valid. 

Following an April 2001 bench trial, the trial court convicted defendant of possession of a controlled substance 
(less than 15 grams of a sub­stance containing cocaine) (720 ILCS 570/402(c) (West 2000)), and the court later sentenced him as stated.  This appeal followed.
 

II. ANALYSIS

A. Standard of Review

In 
People v. Gherna
, 325 Ill. App. 3d 157, 161, 756 N.E.2d 468, 472 (2001), this court held that in reviewing the trial court's determination on a defendant's motion to suppress, the appropriate standard of review is the one set forth by our supreme court in 
People v. Crane
, 195 Ill. 2d 42, 51, 743 N.E.2d 555, 562 (2001).  We adhere to 
Gherna
, and thus, we will not disturb any factual determinations made by the trial court unless they are against the manifest weight of the evidence.  However, we will review 
de
 
novo
 the ultimate determination of whether the evidence should be suppressed.  See 
Crane
, 195 Ill. 2d at 51, 743 N.E.2d at 562.   

B. The Trial Court's Denial of Defendant's Motion To Suppress

Defendant argues that the trial court erred by denying his motion to suppress evidence.  Defendant does not dispute that the initial stop of Roberts' car was valid.  However, he contends that (1) although he was lawfully seized at the beginning of the traffic stop, the police officers' "'strategy' to delay the stop in order to increase the probability of a canine alert was an unconstitutional seizure"; and (2) the officers did not have probable cause to conduct the search of his person that revealed the cocaine.  For the following reasons, we disagree.

1. 
Did
 
the
 
Officers
 
Illegally
 
Seize
 
Defendant
 

During
 
the
 
Traffic
 
Stop
? 

Defendant first contends that although he was lawfully seized at the initiation of the traffic stop, the police officers' "'strategy' to delay the stop in order to increase the probability of a canine alert was an unconstitutional seizure."  We disagree.

Initially, we agree with defendant that he was lawfully "seized" at the initiation of the traffic stop.  In 
People v. Gonzalez
, 184 Ill. 2d 402, 418, 704 N.E.2d 375, 382-83 (1998), our supreme court held that because the public interest in officer safety outweighs the potential intrusion to a passenger's liberty interests, it is not an unreasonable seizure for a police officer "to immediately instruct a passenger to remain at the car, when that passenger, of his own volition, exits the lawfully stopped vehicle at the outset of the stop."  Citing the United States Supreme Court's decision in 
Maryland v. Wilson
, 519 U.S. 408, 137 L. Ed. 2d 41, 117 S. Ct. 882 (1997), the court noted that once an officer effectuates a lawful traffic stop, a passenger of the stopped vehicle is "thereby also stopped."  
Gonzalez
, 184 Ill. 2d at 417, 704 N.E.2d at 382.  See 
Wilson
, 519 U.S. at 413-14, 137 L. Ed. 2d at 47, 117 S. Ct. at 886 ("as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle").  In so holding, the 
Gonzalez
 court reasoned that "ordering occupants to remain at the lawfully stopped vehicle 'does no more than establish the status quo at the time of the stop.'"  
Gonzalez
, 184 Ill. 2d at 420, 704 N.E.2d at 383, quoting 
State v. Webster
, 170 Ariz. 372, 374, 824 P.2d 768, 770 (App. 1991).  Thus, the underpinning of the holding in 
Gonzalez
 is that an officer's order to return to a lawfully stopped vehicle is a minimal intrusion on a passenger's liberty because that passenger is already detained by virtue of the traffic stop and such a command simply maintains the status quo.  

However, this does not end our analysis.  We must address defendant's contention that the police officers' "'strategy' to delay the stop in order to increase the probability of a canine alert was an unconstitutional seizure."  It is well established that in addition to being justified in the first instance, an investigative detention, such as a traffic stop, must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'"  
People v. Brownlee
, 186 Ill. 2d 501, 519, 713 N.E.2d 556, 565 (1999), quoting 
Terry v. Ohio
, 392 U.S. 1, 19-20, 20 L. Ed. 2d 889, 905, 88 S. Ct. 1868, 1879 (1968).  In 
Florida v. Royer
, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 238, 103 S. Ct. 1319, 1325 (1983), the United States Supreme Court made clear that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  "Brevity is an important factor in determining whether a detention was reasonable, but the court should also consider whether the police acted diligently in pursuing the investigation."  
People v. Welling
, 324 Ill. App. 3d 594, 602, 755 N.E.2d 1049, 1055 (2001).  The State bears the burden of showing that a seizure based on reasonable suspicion was sufficiently limited in scope and duration.  
Brownlee
, 186 Ill. 2d at 519, 713 N.E.2d at 565. 

In this case, the trial court found that "somewhat more than 18 minutes" elapsed from the beginning of the traffic stop until Roberts consented to the search of her car (which occurred contemporaneously with the conclusion of the traffic stop).  The evidence showed that during that 18-minute period, Woolford (1) confirmed the status of Roberts' driver's license and her license plate registration, and (2) wrote out and issued two traffic citations.  We agree with the trial court that this amount of time was not "unduly long" to accomplish the traffic stop.  We further reject defendant's claim that the officers strategized "to delay the stop in order to increase the probability of a canine alert," resulting in an unconstitutional seizure.  The record shows that Woolford reasonably believed that the officers were confronted with a situation involving a more serious crime than a routine traffic stop.  As earlier stated, a few minutes into the stop, Woolford and Roop had an approximately three-minute-long discussion, in which (1) Woolford expressed his belief that reasonable suspicion existed to warrant a canine sniff and explained to Roop how the canine sniff worked; and (2) the officers discussed "strategy and what [they] wanted to do."  Woolford acknowledged that during that discussion, he said that the officers "should let the odor get in there pretty good."  However, Woolford also testified that the traffic stop was not delayed in order to allow the smell of any narcotics to permeate the car, and instead, after his brief discussion with Roop, he simply proceeded as he normally would with the traffic stop.  The evidence showed (1) Woolford acted diligently in completing the traffic stop and (2) no indication that the officers delayed the stop in an attempt to obtain evidence.  Accordingly, under these circumstances, we conclude that the 18-minute traffic stop was reasonable in length and scope.  

2. 
Did
 
Cox
 
Lawfully
 
Search
 
Defendant
? 

Last, defendant contends that the search of his person following the canine alert was unconstitutional because it was not supported by probable cause.  We disagree.

Shortly before the police searched defendant and found cocaine in his pocket, they conducted a pat-down search of his person and found some cigarettes and Rolaids.  We note that the State argues at length in support of the trial court's finding that this pat-down of defendant was valid.  However, defendant does not challenge the pat-down search because the police found no contraband when conducting it.  Thus, we need not address its propriety. 

Probable cause exists when "facts exist that would lead a reasonable person standing in the shoes of the police officers to conclude that a crime has been committed and the defendant was the person who committed the crime."  
People v. Robinson
, 167 Ill. 2d 397, 405, 657 N.E.2d 1020, 1025 (1995).  "That is, the existence of probable cause depends upon the totality of the circumstances at the time of the arrest."  
People v. Love
, 199 Ill. 2d 269, 279, 769 N.E.2d 10, 17 (2002).  "'In dealing with probable cause, *** we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act.'"  
Love
, 199 Ill. 2d at 279, 769 N.E.2d at 17, quoting 
Brinegar v. United States
, 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310 (1949).  In addition, the detection of narcotics by a trained dog is a permissible method of establishing probable cause.  
People v. Reeves
, 314 Ill. App. 3d 482, 489, 732 N.E.2d 21, 26 (2000).  

In this case, the trial court found that (1) defendant made a "very short visit" at 2 a.m. to a "known drug house"; (2) upon leaving that house, defendant returned to a car that was unusually parked; and (3) during the traffic stop, the officers observed that defendant's conduct was suspicious.  The court's findings are clearly not against the manifest weight of the evidence.  See 
People v. Luna
, 322 Ill. App. 3d 855, 859, 752 N.E.2d 477, 480 (2001) (the trial court is best suited to assess the witnesses' credibility and weigh their testimony).  We conclude that those facts, when viewed together with the dog's alert on the passenger-side interior door panel, would lead a reasonably prudent person standing in the officers' shoes to conclude that defendant had committed the crime of possessing contraband.  We thus affirm the trial court's determination that probable cause existed to search defendant.

In so concluding, we fully agree with the trial court's  analysis of our decision in 
Fondia
 and the court's determination that this case is distinguishable.  In 
Fondia
, a drug-sniffing dog alerted at the rear seam of the driver's car door.  The defendant had been riding in the backseat on the passenger side of the car.  After the dog alerted, the police searched all of the car's occupants and found contraband on the defendant's person.  
Fondia
, 317 Ill. App. 3d at 968, 740 N.E.2d at 841.  This court held that the dog's alert at the driver's side door did not give rise to probable cause to search all of the car's occupants and that the police should have had the dog sniff all of the occupants, thereby narrowing the focus of the officers' investigation.  We reasoned that the officers' "'willful ignorance'" as to whether the dog would have alerted upon sniffing all of the occupants "dissipate[d] the reasonableness of the police conduct."  
Fondia
, 317 Ill. App. 3d at 970, 740 N.E.2d at 843.  We also noted that the record contained no information about dangers that could be caused by a dog's alerting to an individual.  Instead, in 
Fondia
, this court was presented with nothing more than the appellate prosecutor's "musings" during oral argument about such dangers.  Finally, we emphasized that our holding was "limited to the facts of record and turn[ed] on the absence of 
any
 indicia of suspicion particular to defendant."  (Emphasis in original.)  
Fondia
, 317 Ill. App. 3d at 972, 740 N.E.2d at 844.  

In this case, unlike 
Fondia
, "indicia of suspicion particular to defendant" were present.  As previously mentioned,   (1) defendant made an early morning, "very short visit" to a "known drug house"; (2) upon leaving that house, defendant returned to a car that was unusually parked; and (3) defendant acted suspiciously during the traffic stop.  Further, unlike 
Fondia
, the record here does not suggest that the officers were in a position of willful ignorance, whereby they had the means to further narrow the focus of their search but deliberately chose not to avail themselves of those means.  Instead, the record shows that (1) Lump, the drug-sniffing dog, was an aggressive alert dog; and (2) defendant's safety would have been compromised had Woolford allowed Lump to sniff defendant to see if the dog would alert again.  Accordingly, we agree with the trial court's decision to "give weight to the alerting by the canine to the interior of the vehicle in question."

III. CONCLUSION

In closing, we commend the trial court for its extremely thoughtful written order, which we found very helpful.

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

APPLETON, J., concurs.

COOK, J., specially concurs.

JUSTICE COOK, specially concurring:

I concur.  As I understand it, we are abandoning the holding in 
Fondia
 that after a drug-sniffing dog has alerted on a vehicle, indicating the presence of drugs, the police may not conduct a search of the passengers until the police have conducted a canine sniff of the passengers themselves.  We now accept the proposition that a canine sniff of an individual is not feasible, because of the danger to that individual if the dog should alert on the individual.