# Illinois Official Reports

## Appellate Court

---

### *People v. Reedy*, 2015 IL App (3d) 130955

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. COREY REEDY, Defendant-Appellee.–THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JESUS CHAVEZ, Defendant-Appellee. |
| District & No. | Third District<br>Docket Nos. 3-13-0955, 3-13-0956 cons. |
| Filed | August 26, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Will County, Nos. 12-CF-1481, 12-CF-1480; the Hon. Gerald R. Kinney, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James Glasgow, State's Attorney, of Joliet (Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Steven A. Greenberg and Adam Altman, both of Steven A. Greenberg & Associates, Ltd., of Chicago, for appellees. |
| Panel | JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Justice Holdridge concurred in the judgment and opinion.<br>Justice Lytton specially concurred, with opinion. |

¶ 1     Pursuant to a traffic stop, defendants, Corey Reedy and Jesus Chavez, were found in possession of at least 900 grams of heroin. Each was charged by indictment with unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(1)(D) (West 2012)). The trial court subsequently granted dual motions to suppress the heroin. The State appeals, arguing that the traffic stop was lawful under the fourth amendment. We reverse.

¶ 2                                             FACTS

¶ 3     On June 28, 2012, defendants were each charged by indictment with unlawful possession of a controlled substance with intent to deliver. *Id.* Each indictment alleged that defendants were found in possession of at least 900 grams of a substance containing heroin. Each defendant subsequently moved to suppress physical evidence, arguing that they were unlawfully seized in violation of the fourth amendment of the United States Constitution (U.S. Const., amend. IV), and that any evidence found as a result of that seizure should be suppressed. A hearing on the motions was held on October 10, 2013.

¶ 4     It was adduced at the suppression hearing that on June 17, 2012, Deputy Robert Denny and Sergeant Joe Boers were working patrol for the Will County sheriff's department's gang suppression unit. Denny and Boers were parked on the shoulder of the entrance ramp from Route 53 to northbound Interstate 55. At approximately 12 p.m., the officers observed a white Buick enter onto the ramp. On two occasions the car's passenger-side tires completely crossed over the solid white fog line on the right side of the road. According to Denny, on at least one of these occasions, the tires remained over the fog line for a period of four or five seconds. Denny also testified that the latter of these two occasions occurred once the car was fully onto the interstate, but admitted that he indicated in his report that both instances occurred on the entrance ramp.

¶ 5     Denny and Boers effectuated a traffic stop. The officers exited their cruiser; Denny approached the driver's side of the Buick while Boers approached the passenger. Denny requested identification and proof of insurance from the driver, whom he identified as Reedy. Reedy produced the documents immediately, but Denny observed that Reedy's hand was shaking as Reedy handed the documents to him. Denny testified that while he initially believed that the driver may have been intoxicated due solely to the multiple veers over the fog line, this suspicion was immediately dispelled upon his contact with Reedy. Boers requested identification from the passenger, Chavez, who produced it immediately. Denny retrieved Chavez's license, and then returned to the cruiser to run the names through the Law Enforcement Agencies Data System (LEADS). Denny testified that only "[a] couple of minutes" had elapsed from the time he approached the Buick to the time he returned to his cruiser with the licenses.

¶ 6     While Denny ran the names through LEADS, Boers remained at the passenger side of the Buick. Boers asked defendants if there were any weapons in the vehicle; they responded that there were not. Boers then asked if there were any drugs in the vehicle. Boers observed that both defendants hesitated before answering "no" to the question. Denny testified that in

addition to the hesitation, Boers relayed to him Boers' observation that Reedy looked directly at a black duffel bag on the front passenger-side floorboard during that hesitation.

¶ 7 At some point during the traffic stop, Sergeant Joel Mantia of the Will County sheriff's department arrived on the scene, along with a narcotics canine, Nina. Denny testified that Mantia arrived while he was still in the cruiser, but could not recall if he was still running the names through LEADS or had just finished. Denny agreed that his report indicated that Mantia arrived and assisted Boers while Denny was running defendants' names through LEADS. Boers could not recall precisely when Mantia arrived, but estimated that he arrived "within 2 to 3 minutes. 3 tops."

¶ 8 Denny estimated that the process of running defendants' names through LEADS took between three and five minutes. After ascertaining that both licenses were valid and there were no outstanding warrants for either defendant, Denny decided that he would issue a warning ticket to Reedy. Denny then exited his cruiser and returned to the Buick. He did not bring his ticket book with him at that time.

¶ 9 With all three officers at the Buick, Denny asked Reedy to step out of his vehicle so that he could explain the traffic infraction. Mantia then requested to pat Reedy down for the purpose of officer safety; Reedy consented. In patting Reedy down, Mantia found $1,700 in Reedy's pocket. Reedy explained that he got the money from his business detailing cars. No more than one minute after this pat-down, Denny asked Reedy how long he had known Chavez. Reedy said that Chavez had previously lived in Illinois, and they had known one another for six or seven years.

¶ 10 While the officers spoke to Reedy, Chavez was asked to exit the vehicle. Chavez also consented to a pat-down. After Chavez was patted down, Denny asked Chavez where he lived. Chavez replied that he lived in Los Angeles and had never lived anywhere else. Denny testified that at some point after questioning Chavez, he returned to his cruiser to begin writing the warning ticket. Denny admitted that his report did not indicate that he began writing a ticket. As Denny returned to his cruiser, Mantia retrieved Nina. Denny estimated that "[m]aybe five minutes" had elapsed between his second approach to the Buick and his return to the cruiser to begin writing the warning ticket.

¶ 11 During the ensuing dog sniff of the exterior of the Buick, Nina alerted to the presence of narcotics. Denny testified that Mantia is a trained narcotics officer and Nina is a trained narcotics dog. The subsequent search of the vehicle led to the discovery of a duffel bag–found on the front passenger-seat floorboard–containing the heroin that stood as the basis of defendants' indictments. Defendants were placed under arrest. Denny testified that, according to the computer-aided dispatch notes, either he or Boers called for the Buick to be towed at 12:09 p.m. Denny estimated that seven minutes had passed between his first observation of defendants' vehicle and defendants being placed under arrest. Boers estimated that less than 10 minutes had elapsed from the time the vehicle was pulled over to the time defendants were placed under arrest.

¶ 12 Following arguments, the trial court took the matter under advisement. On November 15, 2013, the court granted defendants' motions to suppress. In ruling, the court stated as follows:

"[T]his is a situation where, I think, the officers were trying to act promptly. They were trying to act within their authority to get–to not delay this stop in terms of time. I think they acted to not do that, but they did, and this stop quickly changed from a crossing the fog line into an all-out sniff and search of the car, I guess.

- 3 -

The evidence presented at the hearing does not support the actions taken by the officers in terms of the reasonable suspicion or probable cause that would lead to the search of the vehicle. It's just not there in this Court's analysis and opinion.

The time delay isn't the issue. It's the conversion of this stop from one tire over the fog line to where we're going through the bags or whatever in the car. The evidence isn't sufficient to support it."

The court later entered a written order reflecting this ruling, with reference to "reasons stated on record."

¶ 13 The State appeals the court's granting of defendants' motions to suppress, arguing that the traffic stop was not unduly prolonged in violation of the fourth amendment, and that the drugs should not be suppressed on any other grounds. Defendants argue that the traffic stop was unnecessarily prolonged and the nature of the traffic stop was fundamentally changed, both in contravention of the fourth amendment. Defendants also argue that the officers initially lacked probable cause to effectuate any traffic stop and that the State failed to prove that Nina was a reliable canine dog or that Nina ever alerted to the presence of narcotics.

¶ 14 On April 10, 2015, we issued an order reversing the ruling of the trial court. Eleven days later, the United States Supreme Court published its decision in *Rodriguez v. United States*, a case in which it concluded that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1612 (2015). We subsequently granted defendants' petition for rehearing, and allowed both parties to rebrief the issues on appeal with *Rodriguez* in mind.

¶ 15                                                    ANALYSIS

¶ 16 "In reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review." *People v. Cummings*, 2014 IL 115769, ¶ 13. Findings of fact made by the trial court are reviewed for clear error, and only reversed if they are against the manifest weight of the evidence. *Id*. However, the ultimate decision of whether or not suppression is warranted is a question of law that is reviewed *de novo*. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). "A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted." *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006) (citing *People v. Pitman*, 211 Ill. 2d 502, 512 (2004)).

¶ 17 With this two-part standard of review in mind, we acknowledge that the trial court's ruling in the instant case contains ambiguities. In fact, the trial court's precise grounds for suppressing the evidence are disputed by the parties on appeal. Defendant argues that the trial court found the officers unduly prolonged the traffic stop, citing the court's comment that the officers "were trying to act within their authority to *** not delay this stop in terms of time. I think they acted to not do that, but they did." The State argues that the court explicitly found that the stop was not unduly prolonged, pointing to the court's statement that "[t]he time delay isn't the issue." Despite these and other ambiguities in the trial court's ruling, the court made no explicit findings of fact to which this court would owe a level of deference. We find that a close parsing of the court's language is, therefore, unnecessary and will proceed with review *de novo*.

¶ 18                                I. Probable Cause for Traffic Stop

¶ 19     Defendant argues first that Denny and Boers lacked the probable cause needed to effectuate a traffic stop. Because the initial seizure of defendants was unlawful, defendants contend, the drugs found in the vehicle should be suppressed as the fruits of that unlawful seizure.

¶ 20     Both the federal and state constitutions protect citizens from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). Vehicle stops are thus subject to the fourth amendment's reasonableness requirement. *Id*. at 810. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."[1] *Id*.

¶ 21     Denny testified that defendants' vehicle crossed over the white fog line twice, causing him to effectuate a traffic stop. Though his report indicated that each of these instances occurred on the entrance ramp to the interstate, Denny testified that the second instance occurred after the vehicle had entered the interstate. Under the Illinois Vehicle Code, whenever any roadway has been divided into two or more marked lanes for traffic "[a] vehicle shall be driven as nearly as practicable entirely within a single lane." 625 ILCS 5/11-709(a) (West 2012).

¶ 22     Defendants contend that the traffic stop was unsupported by probable cause because the State failed to offer any evidence from which the court could infer that it was practicable for defendants' vehicle to remain in a single lane. However, it is well settled that the defendant bears the burden of proof on a motion to suppress evidence. 725 ILCS 5/114-12(b) (West 2012); *People v. Cregan*, 2014 IL 113600, ¶ 23. Only if defendant makes a *prima facie* showing that the evidence was obtained in an illegal seizure does the burden shift to the State to provide evidence to counter the defendant's *prima facie* case. *Id.* Here, defendants neither offered nor induced any testimony at the suppression hearing that would tend to show that the vehicle's multiple breaches of the fog line were justifiable under the improper lane usage statute. Denny's testimony that the car breached the fog line twice, including once on the interstate, supports a finding that the officers did have probable cause to effectuate the traffic stop.

¶ 23     Alternatively, defendants contend that each breach of the fog line occurred on the single-lane entrance ramp. Accordingly, defendants argue, the actions here do not fall under the improper lane usage statute, which is applicable only to roadways "divided into 2 or more clearly marked lanes for traffic." 625 ILCS 5/11-709 (West 2012). However, Denny's testimony that the vehicle breached the fog line a second time once it had entered the interstate refutes this contention. Further, even if both breaches of the fog line had occurred on the entrance ramp, probable cause to effectuate the traffic stop would have nevertheless existed

---

[1]A traffic stop may also be justified under the "reasonable suspicion" standard of *Terry* (*Terry v. Ohio*, 392 U.S. 1 (1968)), a less exacting standard than probable cause. See *Illinois v. Caballes*, 543 U.S. 405, 415 (2005); *People v. Hackett*, 2012 IL 111781, ¶ 28 ("[A] traffic stop may be justified on something less than probable cause.").

under section 11-709.1 of the Vehicle Code, which prohibits driving on the shoulder. 625 ILCS 5/11-709.1(a) (West 2012).

¶ 24                                    II. Execution of Traffic Stop

¶ 25        Even when a seizure is supported by probable cause, and thus is initially lawful, that seizure may violate the fourth amendment "if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). For example, a traffic stop may become unreasonable if it is prolonged beyond the time reasonably required to satisfy its initial purpose, or if police conduct itself independently infringes upon the seized individual's constitutionally protected interest in privacy. *Id*. at 407-08.

¶ 26                                    A. Duration of Traffic Stop

¶ 27        An otherwise lawful seizure "can become unlawful if it is prolonged beyond the time reasonably required" to complete the purpose of the seizure. *Id.* at 407. Determination of whether a traffic stop was unduly prolonged requires an analysis of a totality of the circumstances. *People v. Cosby*, 231 Ill. 2d 262, 275 (2008). Among the circumstances considered are the brevity of the stop and whether the police acted diligently during the stop. *People v. Baldwin*, 388 Ill. App. 3d 1028, 1034 (2009).

¶ 28        Following the directive of *Caballes*, courts have found that traffic stops are unduly prolonged in violation of the fourth amendment where police activity continues after the stop has been completed. *E.g.*, *People v. McQuown*, 407 Ill. App. 3d 1138, 1145 (2011). In the recent case of *Cummings*, 2014 IL 115769, our supreme court held that an officer unreasonably prolonged a traffic stop merely by requesting a driver's license after the officer's suspicion had dissipated upon identifying the gender of the driver. In *McQuown*, a court found a traffic stop unduly prolonged where the "business portion" of the traffic stop lasted just more than 10 minutes, but the officer did not request a canine until 13 minutes after that. *McQuown*, 407 Ill. App. 3d at 1145. In *Baldwin*, this court found that the officer was "apparently ready to conclude the initial purpose of the [traffic] stop" 4½ minutes into the stop, but continued to question the driver, made multiple unsuccessful requests for consent to search the vehicle, and eventually requested a narcotics canine to the scene. *Baldwin*, 388 Ill. App. 3d at 1035. The court held that the stop had been unreasonably prolonged. *Id*. However, in *People v. Staley*, 334 Ill. App. 3d 358, 367 (2002), the court found that a traffic stop lasting 18 minutes was reasonable where officers acted diligently and where there was no evidence that the officers attempted to extend the stop.

¶ 29        As in *Baldwin* and *McQuown*, many cases in which courts have found a traffic stop unreasonably prolonged also involve narcotics canines, and either a delay in requesting the canine or an extended wait prior to the canine's arrival. For example, in *People v. Cox*, 202 Ill. 2d 462 (2002), our supreme court found that a 15 minute lapse between the initial traffic stop and the arrival of a narcotics canine resulted in an unjustifiably long detention. *Id*. at 470 ("[T]he record leads us to conclude this was a routine traffic stop, which should have resulted in a correspondingly abbreviated detention.");[2] see also *People v. Luna*, 322 Ill. App. 3d 855,

_____

[2]As the court pointed out in *Harris*, this proposition from *Cox* remains " 'good law,' " though *Cox* was overruled on other grounds by *People v. Bew*, 228 Ill. 2d 122 (2008). *Harris*, 228 Ill. 2d at 236 n.1.

859 (2001) ("An officer may not stall at the scene of a traffic stop until a drug-sniffing dog arrives and creates probable cause to conduct a search of a vehicle.").

¶ 30    In the case at hand, the narcotics dog arrived on the scene of the traffic stop less than five minutes after the stop had been initiated and before the purpose of the stop had been completed. The officers then asked defendants to step out of the vehicle, an order which is lawful under the fourth amendment. *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). Defendants then each consented to a pat-down. Defendants argue that these actions and the officer's questioning when defendants were out of the car served to unreasonably prolong the stop.[3] Denny estimated that from the time he made his second approach to the Buick to the time he returned to his cruiser to begin writing a warning ticket, only five minutes had elapsed. Of course, the amount of time spent questioning defendants outside of the Buick is only a subset of that five minutes. Any prolongation of the traffic stop, then, would be less than five minutes.

¶ 31    Further, we find it compelling that Mantia and his narcotics canine arrived on the scene almost immediately. Under *Caballes*, officers do not need independent reasonable articulable suspicion of drug-related activity in order to perform a dog sniff pursuant to an ordinary traffic stop. *Caballes*, 543 U.S. at 409. The dog sniff of the Buick was thus an inevitability as soon as Mantia arrived, and no questions of defendants were designed or required to reach that result.

¶ 32    In *Muehler v. Mena*, 544 U.S. 93, 101 (2005), the Supreme Court found that asking questions unrelated to the purpose of a seizure was not unlawful so long as the questioning did not extend the time the defendant was detained. See also *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). Here, though the questioning by Denny and Mantia momentarily delayed the *dog sniff*, the record does not indicate that these questions unreasonably extended the amount of time defendants were detained. Denny was in the process of writing a warning ticket when the dog alerted, and no evidence on the record indicates that, but for Denny's earlier questions, the ticket would have been completed and delivered before the alert.

¶ 33    The entire traffic stop here lasted less than 10 minutes. This is not a case where the officers stalled in order for a narcotics canine to arrive or to otherwise develop probable cause. In *Cummings*, our supreme court recognized that "the fourth amendment does not draw a bright line forbidding all police actions that could prolong a traffic stop even momentarily." *Cummings*, 2014 IL 115769, ¶ 19. Given the extremely short duration of the stop and the diligence of the officers executing that stop, including Mantia's prompt arrival on the scene, we find that the traffic stop in question was not unreasonably prolonged.

¶ 34    The Supreme Court's recent decision in *Rodriguez* does not dictate a different result. In that case, police officer Morgan Struble stopped the vehicle driven by Dennys Rodriguez after observing the vehicle veer onto the shoulder of the highway. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1613. Struble collected identification from Rodriguez and his passenger, Scott

---

[3]Defendants also argue that Denny's decision not to bring his ticket book with him upon his second approach to the Buick unreasonably prolonged the stop. However, we find that reasonable officer safety concerns would motivate an officer in Denny's position to approach a stopped vehicle with his hands unencumbered.

Pollman. *Id.* at ___, 135 S. Ct. at 1613. Struble then began to question Pollman "about where the two men were coming from and where they were going." *Id.* at ___, 135 S. Ct. at 1613. Struble called for a second officer and began writing a warning ticket to Rodriguez for driving on the shoulder of the road. *Id.* at ___, 135 S. Ct. at 1613.

¶ 35 Struble returned to Rodriguez's vehicle to deliver the written warning. *Id.* at ___, 135 S. Ct. at 1613. Struble explained the warning to Rodriguez and returned documents to Rodriguez and Pollman. *Id.* at ___, 135 S. Ct. at 1613. Struble testified that, at that point, Rodriguez and Pollman " 'had all their documents back and a copy of the written warning. I got all the reason[s] for the stop out of the way[,] … took care of all the business.' " *Id.* at ___, 135 S. Ct. at 1613. Struble then asked Rodriguez for permission to walk his narcotics canine around Rodriguez's vehicle. *Id.* at ___, 135 S. Ct. at 1613. When Rodriguez declined, Struble instructed him to turn off the ignition, step out of the vehicle, and stand in front of the patrol car to wait for the second officer. *Id.* at ___, 135 S. Ct. at 1613. When a deputy sheriff arrived, Struble conducted a dog sniff of Rodriguez's vehicle, which ultimately revealed a large bag of methamphetamine. *Id.* at ___, 135 S. Ct. at 1613.

¶ 36 The Supreme Court found that Struble's actions violated the Constitution's shield against unreasonable seizures. *Id.* at ___, 135 S. Ct. at 1612. It held that "[a] seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at ___, 135 S. Ct. at 1612 (quoting *Caballes*, 543 U.S. at 407).

¶ 37 The Supreme Court's decision in *Rodriguez* did not change the law. That is, Struble's actions were clearly unlawful even before *Rodriguez*. The Court itself repeatedly emphasized that its opinion in *Rodriguez* was no more than a reiteration of the rule set forth 10 years earlier in *Caballes*. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1612 ("The Court so recognized in *Caballes*, and we adhere to the line drawn in that decision." ); see also *id.* at ___, 135 S. Ct. at 1616 ("As we said in *Caballes* and reiterate today, a traffic stop 'prolonged beyond' [the completion of the mission of the stop] is 'unlawful.' " (quoting *Caballes*, 543 U.S. at 407)).

¶ 38 Moreover, the primary facts in *Rodriguez* are readily distinguished from those in the case at hand. In *Rodriguez*, Struble testified that he conducted the dog sniff after he had completed the mission of the stop by giving Rodriguez a warning ticket. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1613. Indeed, the Court was explicit that *certiorari* was granted to resolve a division among lower courts on the question "whether police routinely may extend *an otherwise-completed traffic stop*, absent reasonable suspicion, in order to conduct a dog sniff." (Emphasis added.) *Id.* at ___, 135 S. Ct. at 1614. In the present case, Denny was in the process of writing the ticket when the narcotics canine alerted. While the Supreme Court insisted that "[t]he critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket," (*id.* at ___, 135 S. Ct. at 1616) it did not address the possibility that an officer may write a ticket while another officer performs a dog sniff. Absent any evidence that the mission of the traffic stop would have been completed before the dog sniff had Denny and Boers not asked questions earlier in the stop, we find that the officers' actions were lawful.

¶ 39 ### B. Nature of Traffic Stop

¶ 40 Defendants also argue that the traffic stop was conducted in an unreasonable manner where the officers' actions "were completely unrelated to the initial purpose of the stop." Defendants

contend that the officers' actions–including the questioning, pat-downs, seizure of Reedy's property,[4] and search of the Buick–were inconsistent with a traffic stop.

¶ 41 In *People v. Gonzalez*, 204 Ill. 2d 220, 226-28 (2003), our supreme court found that a traffic stop is analogous to an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968), and thus analyzed the reasonableness of police conduct during a traffic stop through application of *Terry*'s two-pronged inquiry. *Gonzalez* held that a traffic stop is lawful if: (1) the stop was justified at inception; and (2) the officers' actions during the course of the stop are reasonably related in scope to the circumstances that originally justified the stop. *Gonzalez*, 204 Ill. 2d at 228. The second prong of this inquiry, or the scope prong, itself has two parts: A traffic stop is unlawful in scope where: (1) the stop was impermissibly prolonged; or (2) police conduct altered the fundamental nature of the stop. *Id*. at 235.

¶ 42 However, as discussed *supra*, the Supreme Court held in *Muehler* that law enforcement officers may ask questions unrelated to the purpose of the initial seizure without running afoul of the fourth amendment. *Muehler*, 544 U.S. at 101. In *Harris*, our supreme court confirmed that the ruling in *Muehler* served to "unequivocally overrule[ ]" the second prong of the scope inquiry in *Gonzalez*. *Harris*, 228 Ill. 2d at 240. Following *Harris*, all that remains of the *Gonzalez* scope inquiry is the duration prong, discussed *supra*. Defendants' argument that the officers' actions in the present case were unrelated to the initial purpose of the stop therefore fails.

¶ 43                                    III. Dog Sniff

¶ 44 Defendants finally argue that the State did not provide any evidence that the narcotics canine used was reliable, or that it even alerted to the presence of narcotics. As a result, the argument proceeds, the officers did not have probable cause to search the vehicle.

¶ 45 Here, again, defendants have misconstrued the burden of proof applicable to a motion to suppress. It remains well settled that the defendant bears the burden of proof on a motion to suppress evidence (725 ILCS 5/114-12(b) (West 2012)), and only if defendant makes a *prima facie* showing that the evidence was obtained in an illegal seizure does the burden shift to the State to provide evidence to counter the defendant's *prima facie* case. *Cregan*, 2014 IL 113600, ¶ 23. Though Mantia was called to testify by the defense at the suppression hearing, the record shows that he was not asked questions on direct examination regarding Nina's reliability or qualifications. As defendants presented no evidence that Nina was unreliable, or even questioned the dog's reliability, defendants forfeited the issue. Clearly, the dog's reliability is a foundational issue. Defendants did not object to testimony that Nina is a trained narcotics dog. Defendants forfeited any objection to lack of foundation for that testimony. *People v. Woods*, 214 Ill. 2d 455, 470 (2005).

¶ 46 Further, the record shows that Denny did testify that Nina alerted to the presence of narcotics in defendants' vehicle, contrary to defendants' argument on appeal. Indeed, Denny also testified that Mantia is a trained narcotics officer and that Nina is a trained narcotics canine. An alert by a trained narcotics canine to the presence of narcotics inside a vehicle creates probable cause to search that vehicle. See *Florida v. Harris*, 568 U.S. ___, ___, 133 S. Ct. 1050, 1057 (2013).

---

[4]The specific issue of the lawfulness of Mantia's seizure of the currency in Reedy's pocket is not raised by either party on appeal.

¶ 47                                           CONCLUSION

¶ 48       For the foregoing reasons, the judgment of the circuit court of Will County is reversed, and this cause is remanded.

¶ 49       Reversed and remanded.

¶ 50       JUSTICE LYTTON, specially concurring.

¶ 51       I concur that the trial court erred in granting defendants' motion to suppress and that the matter should be reversed and remanded. I write separately to address the standard of review.

¶ 52       I do not agree that the standard of review is affected by the trial court's ambiguous ruling. The appropriate standard of review is *de novo* not because the trial court's findings of fact were "ambiguous," as stated by the majority, but because the trial court applied an incorrect legal standard in granting defendants' motion.

¶ 53       Here, the trial court found that the officers' conduct impermissibly altered the fundamental nature of the stop. The State, in its appeal, argues that the trial court used the incorrect legal standard when granting defendants' motion to suppress. The State maintains that the court's conclusion was improper in light of the United States Supreme Court's ruling in *Muehler v. Mena*, 544 U.S. 93, 101 (2005). I agree with the majority that, following *Muehler* and *People v. Harris*, 228 Ill. 2d 222, 240 (2008), all that remains of the scope inquiry is the duration prong. *Supra* ¶ 37. Since we must decide this issue as a matter of law, *de novo* review is appropriate. For that reason, I concur.

¶ 54       Defendants also maintain that the motion to suppress was properly granted because the officers did not have probable cause to stop the vehicle and that the narcotics canine was unreliable. To the extent the trial court made findings of fact relevant to these questions in deciding that suppression was warranted, we should defer to those findings and reverse if they are against the manifest weight of the evidence. Contrary to the majority's suggestion, explicit findings of fact are not necessary to invoke the manifest weight standard when reviewing a motion to suppress determination. See *People v. Matthews*, 357 Ill. App. 3d 1062 (2005); *People v. Rockey*, 322 Ill. App. 3d 832, 841 (2001); *People v. Winters*, 97 Ill. 2d 151 (1983). Since the trial court did not rule on these alternative grounds for reversal, I agree that *de novo* is the appropriate standard of review.