2018 IL App (4th) 160105

NOS. 4-16-0105, 4-16-0106 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 16, 2018
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS,<br>    Plaintiff-Appellee,<br>    v.    (No. 4-16-0106)<br>MAGED N. SADEQ,<br>    Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>) | Appeal from the<br>Circuit Court of<br>Sangamon County<br>No. 14CF380 |
| THE PEOPLE of THE STATE OF ILLINOIS,<br>    Plaintiff-Appellee,<br>    v.    (No. 4-16-0105)<br>IBRAHIM A. SADEQ,<br>    Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>) | No. 14CF381<br><br>Honorable<br>Peter C. Cavanagh,<br>Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Holder White and DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1        In April 2014, the State charged Ibrahim A. Sadeq and his cousin, Maged N. Sadeq (collectively, defendants), with unlawful transportation of unstamped cigarettes (35 ILCS 130/9c (West 2014)) and unlawful possession of unstamped cigarettes (35 ILCS 135/30(d) (West 2014)). In October 2014, defendants filed a motion to suppress the cigarettes and Ibrahim's subsequent statements to the police, claiming the traffic stop and search that produced them was impermissibly prolonged in violation of the fourth amendment.

¶ 2        In December 2014, the trial court conducted a hearing on the motion to suppress at which the Illinois state troopers involved in the stop testified and a video of the stop was played. In February 2015, the court issued a written order denying the motion to suppress. In

June 2015, the trial court conducted a stipulated bench trial and found defendants guilty.

¶ 3        Defendants have filed separate appeals. On this court's own motion, we consolidated these appeals.

¶ 4        Defendants appeal, arguing that the trial court erred by denying their motion to suppress because the traffic stop was impermissibly prolonged without reasonable suspicion of criminal activity. Both defendants also argue that the circuit clerk improperly imposed various fines that must be vacated. Last, Maged argues that he was denied his constitutional right to conflict-free counsel because defendants' attorney did not seek separate trials or advance a valid defense for Maged. We disagree with all of these arguments and affirm.

¶ 5                                I. BACKGROUND

¶ 6                        A. Defendants' Motion To Suppress

¶ 7                1. *The Evidence at the Hearing on the Motion To Suppress*

¶ 8        In December 2014, the trial court conducted a hearing on defendants' motion to suppress, at which the three Illinois state troopers involved in the traffic stop testified, as did Maged. In addition, a video of the traffic stop was played for the court. The evidence presented showed the following.

¶ 9        Illinois state trooper Dustin Weiss testified that he had been an Illinois state trooper for 11 years. In addition to his training at the academy, Weiss had taken a three-week training course with the Drug Enforcement Administration (DEA) in drug interdiction. Weiss had also been working with the DEA for 2½ years on narcotics investigations and money-laundering cases. Weiss was certified as an instructor under a federal program known as the Drug Interdiction Assistance Program, which teaches other officers about drug interdiction. Part of this training includes traffic stops, behavior classes, interviewing techniques, and other

training to recognize possible drug activities during traffic stops.

¶ 10 Weiss testified that on April 23, 2014, at around 10:45 p.m., he was on patrol on Interstate 55 just south of Springfield. Weiss was stopped on the median near mile marker 91, monitoring northbound traffic, when he observed a Ford Taurus traveling 75 miles per hour in a 70 mile-per-hour zone. Weiss caught up with the Taurus, which maintained a speed of 75 miles per hour, and followed it north.

¶ 11 At mile marker 93, Weiss initiated a traffic stop by turning on his emergency lights. The car came to a stop in the middle of the right lane, which immediately raised Weiss's suspicion. In his experience, the vast majority of stops do not involve the car stopping in a lane of traffic. Weiss testified that people who stop in the middle of a lane do so because they are nervous, and, in his experience, every time a car stopped in a lane of traffic, he discovered something that resulted in an arrest.

¶ 12 Using his police car's external public address (PA) system, Weiss instructed the driver of the Taurus to pull over onto the shoulder. He gave this command twice before the Taurus moved over to the shoulder.

¶ 13 Weiss approached the passenger side window of the Taurus and informed the two occupants that they must pull over onto the shoulder when being stopped by the police. Within seconds, he noticed the driver, Ibrahim Sadeq, and the passenger, Maged Sadeq, were extremely nervous. Their hands shook as they handed over their identification and a copy of a rental agreement for the Taurus. Weiss could tell they had rapid heartbeats by viewing the throbbing of Ibrahim's carotid artery and the "bouncing" stomach of Maged. Weiss further observed that Ibrahim's eyes were twitching and Maged's right leg was bouncing up and down.

¶ 14 Just 15 seconds into the stop, Weiss informed defendants they were going to

receive a "quick warning." (We note that the times stated herein are taken from the video of the stop.) After 30 seconds into the stop, Weiss asked defendants where they rented the car. Maged replied, "Avis," and when Weiss again asked where, Maged stated, "the airport." Weiss confirmed through his questioning that they rented the car at an airport in Chicago. He then asked where they were coming from. Defendants stated they were coming from Missouri. Weiss asked where at, and Maged replied, stuttering slightly and speaking with a heavy accent, they had visited one of his "other friends."

¶ 15        Weiss testified defendants answered his simple, initial questions about their travel plans by pausing and stuttering, which led him to believe they were making the answers up on the spot. Weiss further testified he had no difficulty communicating with or understanding defendants at any point.

¶ 16        While standing at the Taurus, Weiss reviewed the paperwork and informed defendants they were travelling 75 miles per hour in a 70 mile-per-hour zone. He stated he was going to check to make sure everything was valid and that he was not going to write them a ticket. One minute and thirty seconds into the stop, Weiss left the Taurus and returned to his police car. Weiss testified he had everything he needed to issue the written warning at that time and stated it takes him about 10 to 12 minutes to complete a written warning.

¶ 17        Once back in his police car, Weiss confirmed with dispatch that the rented Taurus was "clear." Over the next three minutes, Weiss ran a warrant check on defendants and did not learn of any outstanding warrants.

¶ 18        Four minutes and forty-five seconds into the stop, Weiss directed the driver, Ibrahim, over the police car's PA system to "come here," meaning the police car. Weiss explained that he typically invites every driver to whom he issues a written warning to sit in his

police car as he fills out the warning because it is safer than filling it out on the side of the road and because he is a "friendly guy."

¶ 19        Ibrahim exited the Taurus, walked to Weiss's police car, and sat in the front passenger's seat. Weiss again informed Ibrahim that Weiss was just writing a warning, not a ticket, and he began to fill out the written warning form. Weiss then asked where defendants were coming from. Ibrahim told him Missouri. Weiss sought a more specific location, but Ibrahim said he could not remember because he was just with Maged and they were visiting "his friend's father." Weiss asked if they were brothers, and Ibrahim informed him they were cousins.

¶ 20        Weiss asked what time defendants got to Missouri and asked if they went to St. Louis. Ibrahim said they had not gone to St. Louis, they went to Missouri. Ibrahim apologized that his English was not very good. Weiss again asked what time they got there. After considering the question for a moment, Ibrahim replied "maybe five." Weiss asked if they just stayed there for about three hours. Ibrahim responded it was five hours, or maybe three or four hours.

¶ 21        Weiss then asked what the purpose of defendants' trip was. Ibrahim stated they "had some business with his father." Weiss asked what kind of business, and Ibrahim told him it was a gas station and grocery store. Weiss inquired whether they went to a house, and Ibrahim said they just went to the gas station.

¶ 22        Seven minutes and forty-five seconds into the stop, Weiss radioed for backup. The two continued to talk intermittently. Ibrahim informed Weiss he was from another country and was a student here.

¶ 23        Nine minutes into the stop, Weiss turned on the internal camera of his police car. Ibrahim was sitting with his right hand on the back of his neck, occasionally scratching it, as

Weiss filled out the warning ticket.

¶ 24     At nine minutes thirty seconds into the stop, Weiss asked Ibrahim why he was so nervous. Ibrahim said it was because this was the first time he sat in a police car.

¶ 25     Weiss testified that Ibrahim remained extremely nervous throughout their conversation, even though Weiss repeatedly told Ibrahim he would only receive a warning, which would not cost him anything. Weiss explained that, in his experience, drivers relax significantly when they know they are not getting a ticket.

¶ 26     Over the next minute and a half, the following discussion occurred.

"WEISS: You—you don't remember where at in Missouri you went, what city?

IBRAHIM: No, the city, it same, Missouri, but I don't know the exact address.

WEISS: Ok. And you went into the gas station, too?

IBRAHIM: Yeah.

WEISS: Ok. You guys just hung out there?

IBRAHIM: Mmhmm.

WEISS: Didn't go anywhere else?

IBRAHIM: No.

WEISS: Did you guys have any kind of clothes with you? Just your clothes you have on?

IBRAHIM: Yeah.

WEISS: You didn't bring any clothes?

IBRAHIM: No because we were only gonna come back same day.

WEISS: Yeah, ok. Nothin' illegal in the car?

IBRAHIM: No.

WEISS: Ok. Everything in the car is yours?

IBRAHIM: Yeah.

WEISS: Ok. What'd you guys bring with you, anything?

IBRAHIM: No. Bring what?

WEISS: No, did you bring anything like no clothes—

IBRAHIM: No.

WEISS:—or drinks or—

IBRAHIM: No.

WEISS:—food or—

IBRAHIM: No. We eat and drink over there.

WEISS: Uh-huh. You smoke?

IBRAHIM: No.

WEISS: Ok. Cigarettes, not, you know, drugs or—

IBRAHIM: No, I know—

WEISS:—yeah—

IBRAHIM: I know. I don't smoke cigarettes. I'm clean.

WEISS: Ok.

IBRAHIM: So that ticket or warning?

WEISS: No, it's just a warning.

IBRAHIM: Warning?

WEISS: Yeah. Now he rented the car, right?

IBRAHIM: Yeah.

WEISS: What's his name?

IBRAHIM: Maged."

¶ 27 At that moment, 11 minutes and 20 seconds into the stop, Illinois state trooper Clayton Chapman arrived as a backup. Weiss informed Ibrahim he was going to speak with Maged "real quick."

¶ 28 Weiss testified that he went to talk to Maged because he did not believe Ibrahim's story and because he always gives paperwork directly back to the person from whom he received it to prevent allegations of lost or misplaced paperwork. Weiss then exited his police car. At that time, he had completed the written warning and only needed Ibrahim to sign it before the stop would have concluded.

¶ 29 Weiss returned to the Taurus and gave Maged back his license and rental agreement. He then asked many of the same questions he had asked Ibrahim moments earlier. Maged answered them for the most part consistently with Ibrahim's account. Maged stated they had visited his father's friend. He explained that his father was a partner with two similar stores and was looking to become partners with his friend in Missouri. Maged had travelled to Missouri to observe the business at his father's request so he could learn. He stated they arrived sometime in the afternoon and stayed for about five hours. He stated they did not bring any clothes, there was nothing illegal in the car, he had inspected the trunk when he rented the Taurus, and there was nothing in it. Maged did not hesitate before answering questions, though he sometimes stuttered and struggled to find the right word.

¶ 30 Weiss stated it was an "awfully quick trip" and asked Maged why Ibrahim was so nervous. Maged stated he did not know, but indicated that Ibrahim was only 21 years old. Weiss

then explained that he "could believe the story [they] were giving [him], but because of the way [Ibrahim] was acting," he wanted to make sure defendants were not involved in criminal activity. Weiss asked for permission to search the car and Maged declined. Weiss informed Maged that, based on the way defendants were acting, he was going to have a drug dog come and sniff the car because he believed they were involved in criminal activity.

¶ 31 Weiss testified he requested the drug dog based on the following factors: (1) defendants' stopping their car in the middle of the right lane, (2) defendants' travel plan was conflicting and implausible in that it was highly unusual, and (3) defendants remained extremely nervous despite being repeatedly told that they would receive just a warning. Weiss additionally explained that his suspicion was aroused because Ibrahim did not know where he was coming from and could only give a vague description of what he was doing while in Missouri.

¶ 32 Weiss ordered Maged out of the Taurus and sent him to Chapman who was talking to Ibrahim (who had remained seated in Weiss's police car). Chapman took Maged back to his police car. Weiss radioed dispatch to request a drug dog. The stop had lasted 17 minutes at that point.

¶ 33 Weiss got back in his police car. He then radioed the canine unit to determine when it would arrive. The canine unit advised it would be there in "less than 10." Weiss then had Ibrahim sign the written warning. Weiss handed Ibrahim the warning and told him to "drive safe." Ibrahim opened the door to exit the police car, but stopped and asked Weiss "what about [Maged]?" Almost simultaneously, Weiss asked Ibrahim if he would not mind answering a few more questions before he left. Ibrahim indicated he would answer questions and closed the door.

¶ 34 Shortly into the additional questioning, Weiss asked Ibrahim for consent to search the Taurus. Ibrahim initially consented but retracted that consent once he learned Maged had

refused to give Weiss permission to search.

¶ 35 Illinois state trooper Steve Ent and his narcotics-detection dog arrived approximately 8 minutes after Weiss called, which was 25 minutes and 30 seconds into the stop. Ent walked the dog around the Taurus to conduct an open-air sniff. The dog alerted on the trunk of the Taurus. Weiss got the keys to the Taurus and opened the trunk, which contained 480 cartons of cigarettes. The cigarettes had Missouri tax stamps, but not Illinois tax stamps. Weiss arrested defendants for the transportation of unstamped cigarettes.

¶ 36 A few hours later, at the police station, Ibrahim waived his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and admitted to the police that defendants had travelled to Missouri to purchase cigarettes and transport them for resale in Chicago without paying Illinois taxes. The applicable Missouri tax was approximately $0.17 per pack, while in Chicago the applicable tax was approximately $6.16 per pack.

¶ 37 Chapman testified that he provided backup to Weiss during the traffic stop. Chapman could not remember much about the stop and could not say whether he put Maged in his police car or if he remained outside. Ent testified that he was a canine officer on the night of the stop and he responded to Weiss's request. Ent testified that his dog was properly certified at that time. Ent also explained that his dog alerted on the trunk of the Taurus and he assisted Weiss in searching the vehicle. Maged testified he was in Chapman's police car after he was ordered out of the Taurus.

¶ 38 At the conclusion of the hearing, the trial court ordered the parties to submit written arguments, and the parties complied.

¶ 39 2. *The Trial Court's Ruling*

¶ 40 In February 2015, the trial court issued a written order that contained the

following findings of fact:

"1.     Illinois State Police Trooper Weiss had probable cause to initiate a traffic stop.

2.     Trooper Weiss has been a police officer for eleven years, is a member of the Drug Enforcement Administration task force, and has received training in drug interdiction including training on body language and suspicious behaviors.

3.     Trooper Weiss observed nervous behavior and was provided conflicting travel plans.

4.     Trooper Weiss observed that the nervous behaviors did not subside but rather increased during the course of the traffic stop.

5.     Trouper Weiss had reasonable suspicion to detain the defendant[s] to await the canine unit.

* * *

8.     Trooper Weiss did not unnecessarily prolong the stop and his actions do not amount to misconduct."

¶ 41     Based on these findings, the trial court denied defendants' motion to suppress.

¶ 42                    B. The Stipulated Bench Trial and Sentencing

¶ 43     In June 2015, defendants waived their right to a jury trial, and the parties agreed to have the trial court conduct a stipulated bench trial. By agreement, the court took judicial notice of the testimony presented at the hearing on defendants' motion to suppress, as well as the parties' stipulated facts, and found both defendants guilty of unlawful transportation and unlawful possession of unstamped cigarettes.

¶ 44    In February 2016, as part of a negotiated disposition, the trial court sentenced both defendants to two years of conditional discharge and ordered each to serve 14 days in jail. The court also ordered forfeiture of the cigarettes and the imposition of "fines, fees and costs." Per the parties' agreement, the court sentenced defendants only on the possession conviction.

¶ 45    This appeal followed.

¶ 46                                    II. ANALYSIS

¶ 47    Defendants appeal, arguing the trial court erred by denying their motion to suppress because the traffic stop was impermissibly prolonged without reasonable suspicion of criminal activity. Both defendants also argue that the circuit clerk improperly imposed various fines which must be vacated. Last, Maged argues that he was denied his constitutional right to conflict-free counsel because defendants' attorney did not seek separate trials or advance a valid defense for Maged. We disagree with all of these arguments and affirm.

¶ 48                              A. The Standard of Review

¶ 49    When reviewing a ruling on a motion to suppress, a bifurcated standard of review applies. "[T]he trial court's findings of fact are entitled to great deference, and we will reverse those findings only if they are against the manifest weight of the evidence." *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 8, 98 N.E.3d 420. "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 39, 106 N.E.3d 944. A trial court's conclusions of law are reviewed *de novo*. *Heritsch*, 2017 IL App (2d) 151157, ¶ 8.

¶ 50                              B. The Applicable Law

¶ 51    The fourth amendment of the United States Constitution protects the rights of

- 12 -

individuals "against unreasonable searches and seizures." U.S. Const., amend. IV. Reasonableness is the touchstone of fourth amendment analysis and is an objective standard, determined by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

¶ 52 Although a police officer may stop and briefly detain a motorist when the officer has observed the motorist committing a traffic offense (*People v. Abdur-Rahim*, 2014 IL App (3d) 130558, ¶ 26, 16 N.E.3d 903), the traffic stop can become unlawful "if it is prolonged beyond the time reasonably required to satisfy its initial purpose" (*People v. Reedy*, 2015 IL App (3d) 130955, ¶ 25, 39 N.E.3d 318). The United States Supreme Court has observed that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1614 (2015). According to the Supreme Court, "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at ___, 135 S. Ct. at 1614. In a routine traffic stop, the officer's mission includes not only deciding whether to issue a ticket, but also activities such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at ___, 135 S. Ct. at 1615. Although an officer may also conduct checks unrelated to the traffic stop's mission, "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at ___, 135 S. Ct. at 1615.

¶ 53 C. The Appropriate Analytical Framework

¶ 54 Twenty-eight years ago, in *People v. Ricksy*, this court suggested a particular analytical approach for trial courts when deciding motions to suppress evidence. *People v.*

*Ricksy*, 206 Ill. App. 3d 302, 306-07, 564 N.E.2d 256, 259 (1990). Specifically, we explained that "[w]hen, as here, the evidence before the court reveals a series of interactions between the police and a person who is being stopped or searched, the court's analysis should be as finely divided as possible to distinguish among the various stages of that interaction." *Id.*

¶ 55    In *Ricksy*, we outlined the following questions for consideration as an example:

"(1) Was the initial stop of the [vehicle] lawful? (2) Assuming the initial stop to be lawful, did the officer lawfully order the passengers to get out and to stand at the rear of the vehicle? (3) Assuming that order was lawful, did the officer lawfully conduct a pat-down of the defendant? And (4) assuming the pat-down was lawful, did the officer lawfully remove the envelope from defendant's pants pocket?" *Id.* at 307.

See also *People v. Salvator*, 236 Ill. App. 3d 824, 835-36, 602 N.E.2d 953, 959-60 (1992), in which this court applied the analytical framework from *Ricksy*.

¶ 56    Using the *Ricksy* analysis in this case, the relevant questions are the following: (1) Was the initial traffic stop was valid? (2) Assuming the initial stop to be lawful, was the stop prolonged beyond the time necessary to complete the mission of the stop? (3) Assuming it was so prolonged, was the continued detention of defendants supported by a reasonable suspicion? We believe this segmented approach is the best means of determining whether the trial court properly denied the motion to suppress in this case.

¶ 57                    D. The Facts of This Case

¶ 58                    1. *Was There Probable Cause To Stop the Car*

¶ 59    When, as here, a case involves the police stopping a car, the first question a trial court dealing with a motion to suppress must ask is whether the stop was justified at its

inception. *People v. Gonzalez*, 204 Ill. 2d 220, 228, 789 N.E.2d 260, 266 (2003) (holding first consideration under *Terry v. Ohio*, 392 U.S. 1 (1968), is whether officer's action was justified at its inception), *overruled on other grounds by People v. Harris*, 228 Ill. 2d 222, 242, 886 N.E.2d 947, 960 (2008). A police officer is justified in stopping and detaining a driver if the officer observes the driver commit a traffic offense or has probable cause to believe a traffic violation has occurred. *Abdur-Rahim*, 2014 IL App (3d) 130558, ¶ 26; *Whren v. United States*, 517 U.S. 806, 810 (1996).

¶ 60    The parties in this case agree that probable cause existed for the traffic stop because defendants were traveling five miles per hour above the posted speed limit. We also note that the trial court specifically found that Weiss had probable cause to initiate the stop for the speeding infraction.

¶ 61    2. *Was the Stop Impermissibly Prolonged*

¶ 62    a. When Did the Stop Begin?

¶ 63    "[A] seizure that is lawful at its inception" "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In determining whether a stop was impermissibly prolonged, we must first decide when the stop "began." This may seem to be a hyper-technical approach, but it is not, particularly in light of the Supreme Court's decision in *Rodriguez* that there are no such things as *de minimis* extensions of otherwise completed stops. See *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615-16. *Rodriguez* requires that this initial question be addressed and answered.

¶ 64    We conclude that the proverbial "clock" to evaluate the length of a traffic stop begins to run at that moment in time when the vehicles have come to a complete stop and the officer is or reasonably should be prepared to exit his or her police car to approach the vehicle

- 15 -

the officer stopped. In the typical case, this will be the moment when the officer opens the door and exits the police car. However, if the officer is otherwise prepared to exit, and may safely do so, but chooses to remain in his or her vehicle to perform some other action (such as running the license plates to see if the vehicle is stolen), then the clock may begin to run before the officer exits the vehicle.

¶ 65        Here, defendants initially stopped in the middle of the right lane of traffic on an interstate highway. Because it was not safe for the officer to exit his vehicle at that point behind the stopped vehicle, the stop did not begin to run at that point. Instead, Weiss used his vehicle's PA system to order defendants to pull over to the shoulder, and they complied. Once both cars were stopped on the shoulder, Weiss exited his police car without first performing any other action. Therefore, this case is typical, and the clock began to run the moment Weiss exited his vehicle.

¶ 66                                    b. When Did the Stop End?

¶ 67        The next question is when did the stop conclude? The State contends the traffic stop did not conclude until Weiss gave Ibrahim his warning ticket and told him to "drive safe." In support of this contention, the State relies upon *People v. Cosby*, 231 Ill. 2d 262, 276, 898 N.E.2d 603, 612 (2008), which stated the traffic stop in that case came to an end when the officers returned the defendants' paperwork. See also *People v. Brownlee*, 186 Ill. 2d 501, 520, 713 N.E.2d 556, 565-66 (1999) (stop concluded when officer returned license and insurance and explained no citation would be issued). Defendants counter that the stop ended when Weiss had completed writing the warning ticket which was the initial basis for the stop. We agree with defendants.

¶ 68        "In looking at the length of the stop, no bright-line rule has been adopted to

indicate when a stop has been unreasonably prolonged." *People v. McQuown*, 407 Ill. App. 3d 1138, 1144, 943 N.E.2d 1242, 1248 (2011). Instead, the duration of the stop must be justified by the nature of the offense and "the ordinary inquiries incident to such a stop." *Caballes*, 543 U.S. at 408; *People v. Koutsakis*, 272 Ill. App. 3d 159, 164, 649 N.E.2d 605, 609 (1995) ("Courts must consider the purpose to be served by the stop[,] as well as the time reasonably needed to effectuate those purposes."). Courts "employ a contextual, totality of the circumstances analysis that includes consideration of the brevity of the stop and whether the police acted diligently during the stop." *People v. Baldwin*, 388 Ill. App. 3d 1028, 1034, 904 N.E.2d 1193, 1199 (2009).

¶ 69    When deciding whether a traffic stop is impermissibly prolonged, the focus of the inquiry is on "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614. In a routine traffic stop, the officer's mission includes not only deciding whether to issue a ticket, but also activities such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at ___, 135 S. Ct. at 1615. An officer may ask additional questions or have a dog sniff performed, even though those tasks are not related to the mission of the stop if they do not prolong the stop. *Id.* at ___, 135 S. Ct. at 1614-15. Thus, "[t]he critical question *** is not whether the dog sniff occurs before or after the officer issues a ticket, *** but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.' " *Id.* at ___, 135 S. Ct. at 1616. The reasonableness of the stop is determined by "what the police in fact do." *Id.* at ___, 135 S. Ct. at 1616.

¶ 70    Contrary to the State's assertions, there is no *per se* rule that a stop is completed when documentation is returned to the driver. True, the return of paperwork and issuance of a ticket is usually the *clearest* sign that a traffic stop is completed, but it is not the only sign. When

all tasks related to the mission of the stop have been completed, the stop is or reasonably should have been completed, irrespective of whether the officer continues to engage in other actions.

¶ 71    Here, Weiss testified that the written warning was completed when he left his police car to return the rental paperwork to Maged. The only thing missing was Ibrahim's signature on the written warning, which Weiss could easily have obtained. Instead, Weiss proceeded to question Maged for approximately 4½ minutes about defendants' itinerary.

¶ 72    Although Weiss had a valid reason for returning to Maged (handing him back his paperwork personally so no future claim that it was not returned could be made), the additional questioning was not related to the "mission" of the stop. We conclude that the stop "was—or reasonably should have been—completed" at 11 minutes and 20 seconds into the stop.

¶ 73    The State argues the mission of the stop was not yet completed when Weiss spoke with Maged. Alternatively, the State contends that the additional questioning did not "measurably delay" the stop. Last, the State contends that even if this court were to conclude that Weiss prolonged the traffic stop, his doing so was justified by reasonable suspicion to justify further detention. We disagree with the State's first two contentions but agree with its third.

¶ 74    First, although the State makes an oblique reference to officer safety as supporting Weiss's actions, we note that officer safety was not an overriding concern because Chapman had arrived to assist Weiss before Weiss went to the Taurus to question Maged. Thus, there does not appear to be any reason why Weiss had to question Maged before Ibrahim could have returned to the Taurus; Chapman could have escorted Ibrahim to insure officer safety.

¶ 75    Additionally, Weiss's questioning of Maged was not related to officer safety, given that he did not ask Maged about weapons; nor did Weiss's testimony support a belief that Maged was potentially armed and dangerous.

¶ 76 It may be true that Weiss could have asked Maged one or two questions about defendants' itinerary when he returned Maged's paperwork without causing a "measurable delay." Nonetheless, Weiss's 4½-minute questioning cannot be described as an immeasurably brief delay or even a close call. Accepting the State's argument might encourage officers to simply physically hold on to drivers' paperwork to prolong the stop until their questioning is completed. However, as *Rodriguez* instructs, the police must act diligently and may not drag their feet in an attempt to make an otherwise unreasonable stop reasonable. See *Id.* at ___, 135 S. Ct. at 1614 (citing *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985).

¶ 77 Second, it is a stretch to suggest that Weiss's questioning of Maged related to the mission of the stop. Maged could provide no further information that would have supported giving defendants a written warning. Weiss observed the infraction and repeatedly stated that he was going to issue only a written warning.

¶ 78 The State contends that asking about the driver's itinerary is part of the "mission" of any traffic stop. See *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) (holding a police officer may ask driver for an itinerary as part of a routine traffic stop). Assuming this statement is true, Weiss had already thoroughly interrogated Ibrahim about their itinerary. Questioning Maged about the timing of defendants' trip would not have altered the decision Weiss had already made to issue a warning.

¶ 79 Because Weiss had completed the warning ticket when he exited the squad car 11 minutes and 20 seconds into the stop, the mission of the stop had been concluded at that point. Any further detention or questioning would need to be supported by "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615.

¶ 80        3. *Did Officer Weiss Have Reasonable Suspicion To Justify Further Detention*

¶ 81        Having determined that the traffic stop was prolonged, we next consider whether defendants' continued detention was justified by a reasonable articulable suspicion of criminal activity. Defendants argue the trial court's ruling that Weiss had reasonable suspicion was erroneous. We disagree.

¶ 82                                a. The Applicable Law

¶ 83        Reasonable suspicion is based on the totality of the circumstances. *People v. Timmsen*, 2016 IL 118181, ¶ 9, 50 N.E.3d 1092. Officers are entitled to rely on their past training and experience and to make inferences and deductions based on factors that may well elude the untrained person. *People v. Leighty*, 362 Ill. App. 3d 258, 261, 838 N.E.2d 1014, 1018 (2005). The nervousness of a stopped driver may be appropriately relevant in an officer's judgment when assessing suspicious behavior, even though many people are nervous when interacting with the police. See *People v. Davenport*, 392 Ill. App. 3d 19, 27-28, 910 N.E.2d 134, 140 (2009) (citing *United States v. Fernandez*, 18 F.3d 874 (10th Cir. 1994). An officer is free to evaluate a driver's nervousness and the possible reasons therefor as part of the "totality of the circumstances" the officer may consider when determining whether the officer has reasonable suspicion to justify further detention. *People v. Moore*, 341 Ill. App. 3d 804, 810-11, 792 N.E.2d 836, 842 (2003).

¶ 84        Other things to consider are implausible travel plans (*People v. Collins*, 2015 IL App (1st) 131145, ¶ 26, 42 N.E.3d 1), strange behavior, conflicting stories (*People v. Richardson*, 376 Ill. App. 3d 612, 618-19, 876 N.E.2d 303, 309-10 (2007)), and the presence of odors associated with drugs (*People v. Boyd*, 298 Ill. App. 3d 1118, 1127, 700 N.E.2d 444, 450 (1998)) or designed to mask the smell of drugs (*People v. Roa*, 398 Ill. App. 3d 158, 166, 923 N.E.2d 401, 409 (2010)).

¶ 85                                    b. This Case

¶ 86        Defendant argues the trial court erred in considering Maged's responses to Weiss's questioning in determining that Weiss was given "conflicting travel plans." Defendant contends the court's finding that the nervous behaviors "increased" was manifestly erroneous and unsupported by any evidence in the record.

¶ 87        Defendants are correct that the answers Weiss received from questioning Maged after Weiss questioned Ibrahim cannot be considered in evaluating whether reasonable suspicion existed to prolong the stop. The State may not bootstrap subsequently learned information in attempting to establish reasonable suspicion. *Richardson*, 376 Ill. App. 3d at 626 (O'Brien, J., dissenting). However, the record fully supports the trial court's finding that Weiss had reasonable suspicion to justify further detention before he spoke with Maged. Three pieces of evidence, in particular, support this conclusion.

¶ 88        First, it is undisputed that defendants initially stopped in the middle of the right lane on I-55. Weiss testified that based on his prior experience, drivers pull off onto the side of the road the vast majority of the time. He further stated that in his experience, every time a car stopped in the middle of the road, Weiss discovered something that resulted in an arrest.

¶ 89        Second, Weiss testified that in his experience, when a driver is told he or she is receiving a warning instead of a citation, his or her level of nervousness decreases. In this case, however, Weiss testified, and defendants concede, that defendants' nervousness never subsided despite repeatedly being told they would receive a warning.

¶ 90        Third, Weiss testified that defendants gave him a vague and implausible travel plan. Ibrahim told Weiss that they had traveled from Chicago to an unspecified location in Missouri (but not St. Louis) and stayed at a gas station for three to five hours. Ibrahim further

could not give specific answers regarding what defendants were doing while in Missouri. Common experience tells us that travelling for many more hours than one stays at his or her destination is unusual and, when travelling a great distance to cross state lines, can be suspicious. See *United States v. Sokolow*, 490 U.S. 1, 9 (1989) (explaining that few people would travel 20 hours from Hawaii to Miami to spend just 48 hours at that destination, thus contributing to reasonable suspicion).

¶ 91       It was reasonable for Weiss to be suspicious that defendants would travel to Missouri from Chicago and remain there only between three to five hours. Likewise, defendants' purpose for the short trip was not something common, such as seeing a baseball game or attending a family event. Instead, defendants "just hung out" at a gas station, which can certainly be seen as unusual and suspicious. Additionally, Weiss thought it odd that Ibrahim could say only that he was in Missouri and did not know or "remember" the name of the town or address he visited.

¶ 92       We view this case as analogous to *People v. Collins*, 2015 IL App (1st) 131145. There, the defendant who was pulled over for speeding claimed to be heading east, but was traveling in a westbound lane. *Id.* ¶ 5. He claimed that he had exited the highway because his car was overheating and he was looking for a gas station. *Id.* He also claimed he took that route to avoid traffic. *Id.* However, the officers noted defendant had passed two gas stations and his proposed route would have him unnecessarily travel eight miles to avoid less than one mile of traffic. *Id.* ¶ 7. The police ultimately searched the vehicle and defendant, and found drugs in the car. *Id.* ¶ 6. The trial court in *Collins* found that the defendant provided an implausible explanation for what he was doing, justifying the increased suspicion of the officer who stopped the defendant's car, and the appellate court concluded that it would defer to the trial court's

finding. *Id.* ¶ 26.

¶ 93   Defendants argue each of the bases for finding reasonable suspicion can easily be explained as innocent conduct. For instance, they emphasize that they are from a foreign country and sometimes have difficulty communicating in English. They claim it makes sense that foreigners, not well-versed in the methods of law enforcement in the United States, would be extremely nervous and remain so when dealing with police for the first time. Additionally, one who has never been pulled over may not know the proper procedure, thus explaining why Ibrahim stopped in the middle of the right lane on an interstate highway and not on the shoulder. Last, they assert that nervousness is of limited value because each person may show nervousness differently, and if an officer has no prior knowledge of how a suspect normally acts, the officer has no baseline for comparison.

¶ 94   However, as the State correctly notes, defendants cannot prevail by addressing— and attacking—each ground for reasonable suspicion in isolation. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Instead, a court's focus should be on the totality of the circumstances, and even potentially innocent conduct may give rise to reasonable suspicion when aggregated. *Id.* at 273-75; *Sokolow*, 490 U.S. at 9. The police are not required to "rule out" innocent conduct or default to believing behavior is innocent just because they may be presented with an ambiguous situation. *People v. Close*, 238 Ill. 2d 497, 511, 939 N.E.2d 463, 471 (2010).

¶ 95   We find support for our conclusion in the recent decision of the United States Supreme Court in *District of Columbia v. Wesby*, 583 U.S. ___, ___, 138 S. Ct. 577, 589 (2018), in which the Court reversed a decision of a federal appeals court that had concluded the officers involved in that case lacked probable cause to make an arrest. The Court criticized the appellate court majority for engaging "in an 'excessively technical dissection' of the factors supporting

probable cause. [*Illinois v.*] *Gates*, 462 U.S. [213,] 234 [(1983)]. Indeed, the panel majority failed to follow two basic and well-established principles of law." *Id.* at ___, 138 S. Ct. at 588.

¶ 96      The Supreme Court first noted that the panel majority viewed each fact "in isolation, rather than as a factor in the totality of the circumstances." (Internal quotation marks omitted.) *Id.* at ___, 138 S. Ct. at 588. The Court noted that the "totality of the circumstances requires courts to consider the whole picture," explaining that "[o]ur precedents recognize that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." (Internal quotation marks omitted.) *Id.* at ___, 138 S. Ct. at 588. The Court further held that the "totality-of-the-circumstances test precludes this sort of divide-and-conquer analysis" that the panel majority engaged in. (Internal quotation marks omitted.) *Id.* at ___, 138 S. Ct. at 588.

¶ 97      The Supreme Court then pointed out that the "panel majority mistakenly believed that it could dismiss outright any circumstances that were susceptible of innocent explanation." (Internal quotation marks omitted.) *Id.* at ___, 138 S. Ct. at 588. Instead, the Supreme Court explained that "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." (Internal quotation marks omitted.) *Id.* at ___, 138 S. Ct. at 588. The Court concluded by writing the following: "Thus, the panel majority should have asked whether a reasonable officer could conclude— considering all of the surrounding circumstances, including the plausibility of the explanation itself—that there was a substantial chance of criminal activity." (Internal quotation marks omitted.) *Id.* at ___, 138 S. Ct. at 588.

¶ 98      In closing, we note that if Weiss was suspicious for any reason that the car he was following and intending to stop might contain illegal drugs and thought it would be a good idea

to have the drug dog sniff the car, he could have arranged for such a meeting with the drug dog before Weiss ever pulled the car over. *Caballes* instructs that an open air sniff is permissible if it does not unreasonably prolong the stop. *Caballes*, 543 U.S. at 407-09. The simplest way to ensure a sniff is conducted without delaying a normal traffic stop is to request the drug dog before the car is even pulled over.

¶ 99        For instance, in this case Weiss was sitting in the median near mile marker 91 on I-55, which is just south of Springfield, when he observed defendants' car involved in a violation of the Illinois Vehicle Code—namely, speeding. Weiss had no obligation to pull this vehicle over as soon as he could safely do so. Instead, Weiss could have radioed to see where the canine unit was and if it was available. If it was, Weiss could have explained that he was tailing a suspect going northbound on I-55, and Weiss could have asked the canine unit to meet him at a particular location where Weiss planned to pull the car over—for instance, exit 105 near Sherman, Illinois.

¶ 100        If Weiss had taken this course of action and the canine unit was in fact at exit 105 when Weiss pulled defendants' car over, the drug dog could have sniffed at defendants' car during the time Weiss was handling the routine details of the traffic stop, and an issue regarding whether the stop was unduly prolonged would never arise.

¶ 101                                   E. Fines and Fees

¶ 102        Defendants argue that this court should vacate various fine improperly imposed by the circuit clerk. However, we lack jurisdiction to consider these claims.

¶ 103        In its most recent case addressing the alleged improper imposition of fines by a circuit clerk, our supreme court stated, in part, the following:

> "Because the circuit clerk had no authority to levy any fines against defendant, the recording of the additional fines was invalid and unenforceable.

However, the fact that the clerk's action was improper does not mean that defendant can challenge the unauthorized fines through the appeal process. The appellate court is constitutionally vested with jurisdiction to review final judgments entered by circuit courts. The recording of a fine is a clerical, ministerial function and is not a judgment—void or otherwise. Therefore, the improper recording of a fine is not subject to direct review by the appellate court."

*People v. Vara*, 2018 IL 121823, ¶ 23.

Thus, the supreme court concluded that "the appellate court lacked jurisdiction to review the clerk's recording of mandatory fines that were not included as part of the circuit court's final judgment." *Id.*

¶ 104 In this case, defendants argue the following fines were impermissibly imposed by the circuit clerk and should be vacated: $50 "court systems" assessment, $10 "child advocacy" assessment, $15 "ISP op assistance fund" assessment, $5 "drug court fee," $10 "probation op fund" assessment, and a $100 "victims assist fund" assessment. In light of the supreme court's decision in *Vara*, we conclude we have no jurisdiction to review the circuit clerk's imposition of these fines.

¶ 105                    F. Conflict of Interest

¶ 106 Last, Maged raises an issue limited to him. He argues that his counsel acted under an actual conflict of interest when he represented both him and Ibrahim after the trial court had ruled on the motion to suppress and denied it. Specifically, Maged contends he had a viable "reasonable doubt defense" to the transportation charge because he never spoke with police and Ibrahim's admissions concerning the cigarettes could not be used against him at trial.

¶ 107 The State argues Maged did not have a viable reasonable doubt defense because

there was so much circumstantial evidence against him. In particular, the State notes that Maged rented the car in which the cigarettes were found, and Maged admitted to Weiss that his father operated gas stations in Chicago, which strongly suggests the cigarettes were purchased in Missouri for resale in Chicago at his father's stores. The State also claims Maged has failed to show that this defense harmed or conflicted with Ibrahim's defense, and therefore, there was no conflict of interest. We agree with the State.

¶ 108       "When, as here, a defendant does not raise a conflict of interest until after trial," "a defendant must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." (Internal quotation marks omitted.) *People v. Nelson*, 2017 IL 120198, ¶ 30, 89 N.E.3d 725. To demonstrate an actual conflict, a defendant

> " '[f]irst, *** must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.' " *Id.* ¶ 37 (quoting *United States v. Fahey*, 769 F.2d 829, 836 (1st Cir. 1985).

¶ 109       Here, the circumstantial evidence against Maged is quite compelling. In addition to the evidence we previously mentioned, we note that Maged rented the Taurus, admitted to Weiss that he examined the trunk before renting it, and told Weiss the trunk was empty. The police found 480 cartons of cigarettes in the trunk. Accordingly, we conclude that Maged has failed to demonstrate an actual conflict of interest.

¶ 110                                    III. CONCLUSION

¶ 111    For the reasons stated, we affirm the trial court's judgment.

¶ 112    Affirmed.