NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210205-U

NO. 4-21-0205

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 7, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| BRUSHUN ADAMS, | ) | No. 18CF385 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Cavanagh and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding (1) the trial court's denial of defendant's motion to suppress was proper where the traffic stop was justified and not measurably prolonged and (2) the trial court did not rely on improper factors when it sentenced defendant.

¶ 2    During a traffic stop, defendant Brushun Adams was found to be in possession of two kilograms of cocaine. He was charged with two counts of unlawful possession with intent to deliver more than 900 grams of a substance containing cocaine (720 ILCS 570/401(a)(2)(D) (West 2018)). Defendant filed a motion to suppress, arguing the traffic stop was improper and measurably prolonged. The trial court denied defendant's motion to suppress. After a stipulated bench trial, the court found defendant guilty of both counts, merged the two counts, and sentenced defendant to 30 years' incarceration. Defendant appeals, arguing the court (1) erred in

denying his motion to suppress and (2) relied on improper factors when it sentenced defendant. We affirm.

¶ 3                                                              I. BACKGROUND

¶ 4             In December 2018, the State charged defendant with two counts of unlawful possession with intent to deliver more than 900 grams of a substance containing cocaine (720 ILCS 570/401(a)(2)(D) (West 2018)). At defendant's preliminary hearing, Illinois State Police Trooper Joseph Gray testified he observed a black Toyota Avalon, defendant's vehicle, traveling southbound on Interstate 55. Gray observed defendant cross the fog line on the right side of the interstate. Gray attempted to move behind defendant's vehicle, but another vehicle followed closely behind defendant's vehicle and Gray was not able to immediately move into the right lane. Eventually, Gray moved to the right lane behind defendant's vehicle, activated his dash camera, and conducted a traffic stop. Defendant appeared nervous during the stop. Gray testified he called for a K-9 officer to assist him. While waiting for the K-9 officer, Gray completed a written warning for improper lane usage and began completing a ticket for expired insurance. Defendant sat in Gray's vehicle. Gray testified defendant seemed increasingly more nervous. Trooper Justin Lankford arrived with his canine partner, Xander, and the dog alerted to the presence of a controlled substance in defendant's vehicle. The troopers searched the vehicle and located a black bookbag containing two kilograms of cocaine.

¶ 5                                                           A. Motion to Suppress

¶ 6             In July 2019, defendant filed a motion to suppress evidence. In his motion, defendant argued for the suppression of all evidence "obtained as a result of the unlawful traffic stop, unlawful seizure and unlawful detention of [defendant], as well as, all evidence seized during the unlawful search of the vehicle he was driving." Defendant argued, *inter alia*, that

(1) he did not violate any traffic laws and thus, there was no valid basis for the traffic stop and (2) Gray improperly prolonged the stop to facilitate the free-air sniff.

¶ 7            At the September 2019 hearing on the motion to suppress, defense counsel's paralegal, Alice Rolf, testified that she had watched the audio and video recording of the traffic stop from Gray's dash camera approximately 40 to 50 times. She identified landmarks in the video and used those to put together a collection of pictures obtained from Google Earth tracking the roadway where the traffic stop took place. Rolf did not know the date the Google images were originally taken. The trial court admitted exhibits of the referenced pictures and a demonstrative exhibit noting the time of the recording as the trooper passed certain landmarks.

¶ 8                              1. *Defendant's Testimony*

¶ 9            Defendant testified he lived in Springfield and had worked as an "intern" for his brother's heating and cooling business for two years. On December 29, 2018, defendant was traveling from the Chicago area with his two daughters when he had a "blowout" around Joliet, Illinois. He called his insurance company, and the insurance company sent roadside assistance to replace his flat front passenger tire with a donut—a small, space-saving spare tire. Defendant testified that the roadside mechanic advised him that he would experience some pulling to the right, the ride would be rough, and he would only be able to drive between 55 and 60 miles per hour. Defendant confirmed that as he resumed driving, his vehicle "[d]efinitely was pulling to the right." Defendant felt nervous and a "little scared" driving on Interstate 55 with the donut, as he was warned it was prone to another blowout.

¶ 10            Defendant was not aware of Gray behind him until Gray turned on his emergency lights. Gray approached defendant's passenger side window; upon Gray's request, defendant produced his driver's license and insurance card. Defendant believed his insurance card was

- 3 -

valid, as he had just received it in August or September 2018, but he did not look at the card before giving it to Gray. Defendant testified he has a medical condition, essential tremors, which causes tremors in his arms and hands with movement. Defendant denied crossing the fog line. On cross-examination, defendant stated he could control the vehicle and he did not have to "fight" against the pull.

¶ 11 After defendant's testimony, defense counsel argued he had demonstrated "there was no Illinois Vehicle Code violation," and the search was therefore unlawful, so the burden should shift to the State. When the court appeared to disagree, defense counsel elected to call Gray, and the cause was continued.

¶ 12                              2. *Dash Camera Video Recording*

¶ 13 In February 2020, the hearing reconvened with the testimony of Gray. Defendant presented an uncertified transcript of the dash camera and dispatch recordings for demonstrative purposes, which was admitted without objection.

¶ 14 Defense counsel played the entire dash camera video recording, approximately 90 minutes in length. We note the recording is very grainy and of low quality, but it appears to show the following. The recording begins with Gray following a vehicle traveling immediately behind defendant's vehicle. Gray moved into the left lane, passed the vehicle traveling immediately behind defendant, and then moved to the right lane, between the two vehicles. As Gray followed defendant, the recording shows defendant's vehicle moving multiple times within his lane from the far right fog line to the far left. Gray activated his emergency lights and initiated a traffic stop. Defendant signaled, passed an exit ramp, and pulled his vehicle to the shoulder. Gray approached defendant's vehicle and informed him as follows: "The reason I stopped was you were driving like 52 miles an hour down the interstate and you are all over the road. Okay? I

don't know if you had something to drink tonight or (unintelligible) but that's the reason." Defendant informed Gray he had a flat tire and was driving on a donut, which Gray visually confirmed. Gray asked defendant where he was headed and defendant stated he was headed to Springfield. Gray asked defendant, "[W]hat part of Springfield?" Defendant expressed confusion, but then stated he lives in Springfield off Taylor Street. Gray advised defendant he is also from the Springfield area and asked defendant where he attended high school. Defendant responded, "Southeast," and the two laughed over the confusion.

¶ 15　　　　Gray returned to his vehicle and contacted dispatch to send a K-9 officer. Gray had the following conversation with Trooper Lankford:

> "I stopped this guy because he was all over the road. He's uh, he's on his way back. He's going to like Springfield from Chicago. There was a car following him but I uh I barely had the chance to squeeze in here. They were following him and they just went off. I don't know where they are at. Just stopped over here at the 197. But uh this dude is like absolutely shaking and *** his heart is like literally pounding out of his chest. He like uh and he's got a little kid in the back so I don't know what this guy is going to do. *** [He]'s on one side of the lane and then the other and then across the lane like 198 ½ or 199, right around there. But uh anyway he's freaking out so I don't know if I'm going to try and just have him get out and come back here and talk to me. So do you want him out of the vehicle for the search? Because to be honest with ya, I'm nervous this dude is going to take off if the dog's out."

¶ 16　　　　Approximately eight minutes after returning to his vehicle, Gray approached defendant's vehicle a second time. Gray asked defendant to "come out and talk to me real

quick." Gray informed defendant he would not write a ticket for the lane infraction but asked about his insurance card. Following a pat down search of defendant, the two men walked to Gray's patrol vehicle. Gray informed defendant his insurance card had expired, and defendant appeared surprised. Gray told defendant he was required to write a ticket for driving without insurance, and they discussed how the process works. Gray then engaged defendant in casual conversation about his daughters, the blown tire, and the earlier confusion.

¶ 17        Approximately 14 minutes and 40 seconds after the stop began, Lankford arrived with the canine. The canine alerted on defendant's vehicle. The video then continues through the search and defendant's arrest.

¶ 18                        3. *Trooper Gray's Testimony*

¶ 19        Trooper Gray testified that on the evening of December 29, 2018, he was patrolling on Interstate 55 in Livingston County. Gray testified that he noticed defendant's car around mile marker 200 but did not turn on his video camera until mile marker 198½, after he saw defendant cross the fog line. The warning ticket noted defendant crossed the fog line at mile marker 199. Defense counsel noted the beginning of the video showed an exit ramp, which Gray agreed was the exit ramp at mile marker 201, and his camera was therefore activated prior to mile marker 198½. Gray followed defendant for "[a]pproximately two or three" miles before conducting the stop.

¶ 20        Gray agreed he never used the words "crossed the fog line" when he approached defendant about the stop because he "speak[s] to [drivers] like a human being." Gray decided to give defendant a written warning after he confirmed defendant was driving on the donut. Gray spoke with defendant about his destination for safety reasons. He was, however, just making

- 6 -

conversation when he asked defendant where in Springfield he was going and what high school he attended.

¶ 21 Gray did not use his flashlight to check defendant's insurance card while standing at defendant's car because he "typically tr[ies] to get out of the highway as soon as [he] can." In his patrol vehicle, Gray was checking defendant's documents before he spoke with Trooper Lankford. Gray called Lankford to explain why he wanted Lankford to respond to the call and precisely where he was located. Gray estimated it takes approximately 15 minutes to issue a written warning, but some warnings take longer than others. Gray testified he routinely asks to perform a pat-down search on anyone he brings back to his car, but he did not have any particular suspicion defendant had a weapon.

¶ 22 When defense counsel asked Gray when he started writing the insurance ticket, Gray could not recall. Defense counsel recalled Gray's testimony from defendant's preliminary hearing, and the following colloquy occurred:

> "Q. Do you remember being asked this series of questions and giving this series of answers under oath?
>
> [']Question by Mr. Yedinak: Is that when Trooper Lankford showed up with his canine partner?
>
> Answer: No. I had completed the written warning and reapproached the vehicle because the insurance card he provided me was expired and I asked him to come back to my vehicle.
>
> Question by Mr. Yedinak: What happened after that?
>
> Answer by you: As he sat in my vehicle, it seemed as though he was becoming more excited, anxiety levels; and as Trooper Lankford pulled up, I had

explained to [defendant] that I was going to have to write him a ticket for the insurance, comma, which he said that's fine. I began writing him the ticket waiting on the canine officer; and when Trooper Lankford and Xander showed up and [defendant] saw the dog out the window, he questioned why the dog was there.[']

Did you give that, those answers to those questions?

A. Yes, sir.

Q. So you began writing the insurance ticket when you saw Trooper Lankford pulling up?

A. Yes, sir."

¶ 23        On cross-examination, Gray testified that several factors made him believe defendant might try to flee if he saw the K-9 officer. Gray testified as follows:

"He was nervous when I walked up to the car. I attempted to make conversation with him about where he was going and noticed he was breathing really hard. I could see his clothes rising on him. I could see the pulse of his heart in his neck and his hands were shaking when he gave me the documents I requested."

Gray also testified there was a car following defendant closely. When Gray attempted to pull in behind defendant's vehicle, the other vehicle attempted to close the gap between it and defendant's vehicle. Gray believed defendant was traveling around 50 miles per hour, while other traffic was moving at around 70 miles per hour. Gray testified he typically engages in polite conversation when he conducts a traffic stop.

¶ 24                                 4. *Trial Court's Ruling*

¶ 25    The trial court issued a written order denying defendant's motion to suppress. As part of its factual findings, the court determined Gray observed defendant's vehicle "swerving within its lane and had crossed the fog line." The court found that when Gray returned to his vehicle after initially speaking with defendant, he prepared the warning ticket and also had a phone conversation with Trooper Lankford. The court also determined that "[a]lthough Trooper Gray testified that he does not recall exactly when he started writing the insurance citation, you can hear him typing on his laptop at 13:07 on the DVD and he then indicates he is working on something at 13:31 on the DVD." The court noted, about 4 minutes and 48 seconds after getting in the car, Gray told defendant, " 'Listen, all I'm going to have you do is sign for this ticket so I can give you your license back' " and the K-9 officer arrived 34 seconds after that statement.

¶ 26    The trial court disagreed with defendant's characterization of Gray as an " 'exaggerator', a 'fabricator,' and a 'delay[e]r.' " Rather, the court found Gray to be "credible, consistent and his testimony was corroborated by the other evidence in this case." Conversely, the court found defendant's testimony inconsistent, and the "inconsistency raise[d] serious doubts about defendant's credibility."

¶ 27    The trial court found Gray had a "reasonable and articulable suspicion" to conduct a traffic stop. Additionally, the court found, when looking to the totality of the circumstances, Gray did not "unduly prolong[ ] the traffic stop beyond the time reasonably required to satisfy the purpose of the stop." Finally, the court found, assuming *arguendo* the stop was prolonged, Gray had probable cause to justify detaining defendant until Lankford arrived.

¶ 28                          B. Stipulated Bench Trial

¶ 29    In July 2020, the trial court held defendant's stipulated bench trial. The State and defendant presented an agreed stipulation of facts including, among other things, that the Illinois

State Police Division of Forensic Sciences conducted an analysis of two green plastic wrapped packages recovered by Trooper Gray from the trunk of defendant's vehicle. That analysis established that the two packages contained cocaine and weighed 987.3 grams and 1001.5 grams, respectively. The court found defendant guilty of two counts of unlawful possession with intent to deliver more than 900 grams of a substance containing cocaine (720 ILCS 570/401(a)(2)(D) (West 2018)).

¶ 30    Defendant filed a posttrial motion arguing the trial court erred in denying defendant's motion to suppress, which the court denied.

¶ 31                                C. Sentencing

¶ 32    The trial court ordered a presentence investigation report (PSI). The PSI stated defendant was 39 years old. Defendant's criminal history included one prior felony charge in Texas for money laundering, which was a deferred adjudication. The PSI reflected defendant's statement that he was employed full-time as of September 2020, but he had not worked more than six months in the past year. Defendant described himself as a stay-at-home father for his young daughter, who had developmental disabilities. His main sources of income were from his mother and brother.

¶ 33    In mitigation, defendant presented eight letters to the court testifying to his character.

¶ 34    The State argued defendant was transporting unusually high quantities of cocaine, two kilograms, and had no other visible means of support. The State pointed to defendant's "prior felony conviction" in Texas for money laundering and argued as follows:

"It does not take too much thought to figure out what's going on when you have an individual caught money laundering down in Texas. Money laundering is when

- 10 -

you are using money that's illegally obtained and trying to make it clean, and then

he's caught up here with two kilos of cocaine. Again, it doesn't take too much to

figure out the Defendant is running drugs. That's what he's doing. He got caught

doing it in 2005, or at least part of it; and now he's got caught doing it again in

2018."

Based on the factors in aggravation, the State recommended a sentence of 30 years in prison.

¶ 35        Defense counsel countered the State's argument as to money laundering, arguing

that it was "very clear from the presentence report that this was a deferred adjudication offense,

meaning that there was no conviction." Further, he argued the State connecting that adjudication

to drugs was "wildly speculat[ive]." Defense counsel argued defendant had been working for his

brother's heating and cooling company, although it was not included in the PSI. Defense counsel

recommended a sentence of 15 years in prison.

¶ 36        Defendant made a statement in allocution apologizing to his family and

requesting leniency.

¶ 37        The trial court began by considering the following three factors set forth in

section 411 of the Illinois Controlled Substances Act (720 ILCS 570/411(West 2018)): (1) that

defendant's offenses involved cocaine as a Schedule II controlled substance, (2) the offenses

involved unusually large quantities of a controlled substance, and (3) defendant lacked any other

visible means of support. The court then began discussing factors in aggravation, stating:

            "There are strong factors in aggravation in this case. First of all, I would

            argue and I believe the case law supports the Court's argument or I guess the

            Court's, it's not an argument, but the Court's assessment that the Defendant's

            conduct threatened serious harm. Sure, nobody was, we have no evidence of who

received this cocaine; but there's absolutely no doubt that it would have, it was eventually going to be distributed to multiple sources. And those multiple sources—And I mean hundreds, I think hundreds of people. You are talking about four and a half pounds so that's a lot of people that are going to, could have access to this cocaine.

And when I think about delivery of a controlled substance, you know, here we're even talking possession with intent to deliver, my point, and I'm very well aware not to double enhance, [defense counsel], my point is simply that distributing or intending to distribute these drugs within the community does have the potential of causing very serious harm not only to the people that use the drug but emergency responders that may be responding to an overdose victim, law enforcement that may be involved in responding, a heightened possibility of accidents. We actually see that happen where law enforcement and first responders are trying to respond to a scene and bam, there's an accident.

So there is I believe a very real potential for harm in this case. Now thank God nobody got those drugs. Thank God nobody got these drugs. Four and a half pounds of cocaine. So that is a factor I believe in aggravation."

The court went on to discuss deterrence as the strongest aggravating factor in this case. The court discussed defendant's history, stating:

"I've never seen I guess to quote [defense counsel], a mule come through here. It is beyond me how someone bumps into somebody and agrees to deliver four and a half pounds, two kilos of cocaine. Those people aren't just at the grocery store. They are not just like, oh, hey, can you take this head of lettuce to my mom.

People don't just give a stranger four and a half pounds of cocaine to deliver somewhere. It just doesn't happen unless you know the right people.

And I have to say I am persuaded by [the State's] argument concerning this strange money laundering issue out of Texas when you are from Illinois. You have always been in Illinois. You went to school in Illinois. But you land yourself in Texas for no other reason than money laundering? It is a little suspicious.

And so I do think that your record, your prior record is an aggravation. More importantly, don't try to tell me this is your first time in court. You know the song and dance, and you knew what you were doing this time just like you knew what you were doing in Texas.

\* \* \*

What's your job? Running money and drugs across the country. That's exactly what the record shows your job is. And this isn't the first time because on the first time I might be willing to say, okay, poor [defendant] got caught. No. It's the second time. You and I know it. You and I both know it's the second time and probably many more that you didn't get caught. I didn't just get off the train yesterday."

The court noted defendant had a college education and a supportive family but chose to be involved with drugs. The court found defendant had not accepted responsibility for his actions and there were no strong mitigating factors. The court sentenced defendant to the State's recommendation of 30 years' imprisonment.

¶ 38        D. Defendant's Motion to Reconsider His Sentence

¶ 39 Defendant filed a motion to reconsider his sentence, arguing the trial court erred by (1) considering the three section 411 factors (see 720 ILCS 570/411(West 2018)), (2) treating defendant's 2005 deferred adjudication in Texas as a conviction and drawing "a series of unsupported inferences" about the offense, and (3) discussing a factor inherent in the offense, namely the potential for serious harm. In deciding the motion, the trial court relied on *People v. McGath*, 2017 IL App (4th) 150608, for the principle that the potential for serious harm may be considered in the context of the serious nature of the charge. The court stated, "I accurately stated at the sentencing hearing, this, this is a very serious matter. I did not consider [the potential for serious harm] as a statutory aggravating factor, but it is certainly something that the Court is mindful of and should be mindful of."

¶ 40 As to the Texas adjudication, the trial court found the offense was identified in the PSI as a deferred adjudication, and any reference to the offense as a conviction by the State was corrected by defense counsel. Further, the court found it could "draw any reasonable inferences I wish to from the evidence that's presented at the sentencing hearing. And I do not think *** the inference that the Court drew is unreasonable under all of the facts and circumstances that were presented to me on the day of sentencing."

¶ 41 The trial court denied defendant's motion to reconsider his sentence.

¶ 42 This appeal followed.

¶ 43 II. ANALYSIS

¶ 44 On appeal, defendant argues (1) the trial court erred in denying his motion to suppress and (2) the court relied on improper factors when it sentenced defendant. We disagree and affirm.

¶ 45 A. Motion to Suppress

¶ 46 We review a trial court's decision on a motion to suppress under a bifurcated standard of review. *People v. Salamon*, 2022 IL 125722, ¶ 75. Under this standard, "the trial court's findings of historical fact are reviewed for clear error and may be rejected only if they are against the manifest weight of the evidence, but the trial court's ultimate ruling as to whether suppression is warranted is reviewed *de novo*." (Internal quotation marks omitted.) *People v. Aljohani*, 2022 IL 127037, ¶ 28. "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 39.

¶ 47 Both the United States and Illinois Constitutions protect the rights of individuals against unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. "The touchstone of the fourth amendment is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *People v. Timmsen*, 2016 IL 118181, ¶ 9 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). In Illinois, courts interpret the protections of the Illinois constitution against unreasonable searches and seizures in "limited lockstep with its federal counterpart." (Internal quotation marks omitted.) *Aljohani*, 2022 IL 127037, ¶ 31.

¶ 48 Although a police officer may stop and briefly detain a motorist when the officer has observed the motorist committing a traffic offense (*People v. Abdur-Rahim*, 2014 IL App (3d) 130558, ¶ 26), the traffic stop can become unlawful "if it is prolonged beyond the time reasonably required to satisfy its initial purpose" (*People v. Reedy*, 2015 IL App (3d) 130955, ¶ 25). The United States Supreme Court has observed that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the

traffic violation that warranted the stop." *Rodriguez v. United States*, 575 U.S. 348, 353-54 (2015). According to the Supreme Court, "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. In a routine traffic stop, the officer's mission includes not only deciding whether to issue a ticket, but also activities such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. Although an officer may also conduct checks unrelated to the traffic stop's mission, "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

¶ 49 This court employs a segmented approach when reviewing a traffic stop pursuant to a motion to suppress. *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 56. The relevant questions are the following: "(1) Was the initial traffic stop *** valid? (2) Assuming the initial stop to be lawful, was the stop prolonged beyond the time necessary to complete the mission of the stop? (3) Assuming it was so prolonged, was the continued detention of defendant[ ] supported by a reasonable suspicion?" *Id.*

¶ 50                                  1. *Was the Initial Traffic Stop Valid?*

¶ 51 Defendant first argues Gray's traffic stop was unwarranted and therefore the stop was unconstitutional from the outset.

¶ 52 "Pursuant to *Terry*, a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to commit, a crime." *Timmsen*, 2016 IL 118181, ¶ 9. Vehicle stops, a police officer's act of "stopping a vehicle and detaining its occupants," constitute "seizure[s]" within the meaning of the fourth amendment and are thus analyzed under the principles set forth in *Terry*. *Id.* "The

officer must have a 'reasonable, articulable suspicion' that criminal activity is afoot." *Id.*
(quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). While "reasonable, articulable
suspicion" constitutes a less demanding standard than probable cause, the "officer's suspicion
must amount to more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal
activity." *Id.* (quoting *Terry*, 392 U.S. at 27). Furthermore, "[t]he investigatory stop must be
justified at its inception[,] and the officer must be able to point to specific and articulable facts
which, taken together with rational inferences from those facts, reasonably warrant the
governmental intrusion upon the constitutionally protected interests of the private citizen." *Id.* In
judging the police officer's conduct, this court applies an objective standard and considers,
" 'would the facts available to the officer at the moment of the seizure or the search "warrant a
man of reasonable caution in the belief" that the action taken was appropriate?' " *Id.* (quoting
*Terry*, 392 U.S. at 21-22). When evaluating a vehicle stop's validity, "we consider the totality of
the circumstances—the whole picture." (Internal quotation marks omitted.) *Id.*

¶ 53          Crossing a fog line is a violation of the Illinois Vehicle Code. "[W]hen a motorist
crosses over a lane line and is not driving as nearly as practicable within one lane, the motorist
has violated [Section 11-709 of the Illinois Vehicle Code]." *People v. Smith*, 172 Ill. 2d 289, 297
(1996) (citing 625 ILCS 5/11-709 (West 1992)). The trial court determined defendant "had
crossed the fog line." This is a factual determination, and we will defer to the court's finding
unless it is against the manifest weight of the evidence. See *Aljohani*, 2022 IL 127037, ¶ 28.

¶ 54          Defendant first argues the video recording does not show defendant crossing the
fog line. Defendant asserts the video recording is the "best evidence" of defendant's driving but
acknowledges the recording is "less than ideal." The video recording, though of poor quality,
shows defendant driving on the extreme left and extreme right-hand sides of a single lane at

- 17 -

various points. The video does not show defendant's vehicle crossing the fog line. However, Trooper Gray explained that he activated his camera *after* he observed defendant cross the fog line. The trial court, as it was entitled to do, credited Gray's testimony in this regard.

¶ 55　　　　Defendant nevertheless argues Gray's testimony defendant crossed the fog line was not reliable as Gray did not specifically inform defendant he crossed the fog line during the traffic stop. Defendant argues Gray was trained to tell drivers of specific traffic violations they had committed, and since he did not inform defendant he crossed the fog line, defendant must not have crossed the fog line. However, Gray did inform defendant he was "all over the road." Although not a recitation of the section of the vehicle code Gray believed defendant violated, in Gray's words, "We're not robots. I speak to them like a human being." The trial court was not required to discount Gray's testimony concerning defendant crossing the fog line just because Gray advised defendant he was "all over the road," and not specifically that he had crossed the fog line.

¶ 56　　　　Defendant also argues he testified he did not cross the fog line. However, defendant's assertion he did not cross the fog line is insufficient for us to find the trial court's factual determination that defendant did cross the fog line was against the manifest weight of the evidence. We note the court found Gray to be "credible, consistent and his testimony was corroborated by the other evidence in this case." Conversely, the court found defendant's testimony inconsistent, and the "inconsistency raise[d] serious doubts about defendant's credibility."

¶ 57　　　　We find that the trial court's factual determination that defendant crossed the fog line was not against the manifest weight of the evidence. Consequently, we find that Gray had

reasonable suspicion defendant had violated the Illinois Vehicle Code and justification to conduct a vehicle stop. See *Timmsen*, 2016 IL 118181, ¶ 9.

¶ 58    Defendant further asserts his driving was not suspicious. For example, defendant argues he was not "weaving erratically." However, no one argued defendant was driving "erratically." In the dash camera video, defendant can be seen moving between the extreme left and right sides of his lane without visible cause. Defendant also argues he was not driving at the exact speeds Gray testified to, offering detailed mathematical calculations in support of his argument. However, even if Gray was incorrect about the exact speed defendant was traveling, defendant readily admitted to driving 55 to 60 miles per hour because of the donut in an area where the speed limit was 70 miles per hour, and the dash camera video recording showed defendant traveling significantly slower than the surrounding traffic. The record shows several factors that, together, showed defendant's driving was concerning. We note Gray initially suspected defendant may have been intoxicated when he approached the vehicle.

¶ 59    We note further that, in the video recording, defendant did not deny there was a reason for Gray to find his driving suspicious. When Gray informed defendant he pulled defendant over for driving well below the speed limit and "all over the road," defendant explained he was driving on a donut. "Even where there may be an innocent explanation for each individual factor considered separately, the factors viewed in combination may constitute enough reasonable suspicion to warrant further detention." *People v. Easley*, 288 Ill. App. 3d 487, 491-92 (1997). However, in this case, the traffic stop was justified solely on defendant crossing the fog line, and any further suspicious driving only bolstered Gray's reasonable suspicion a traffic stop was appropriate. See *Timmsen*, 2016 IL 118181, ¶ 9.

¶ 60    2. *Was the Stop Impermissibly Long?*

¶ 61 Defendant next argues that, even if we find that the traffic stop was justified, the stop was unreasonably prolonged to facilitate the free-air sniff by Trooper Lankford and his dog.

¶ 62 "A lawfully initiated traffic stop may violate the fourth amendment if it is prolonged beyond the time reasonably required to complete its mission and attend to related safety concerns." *People v. Bass*, 2021 IL 125434, ¶ 16. "[O]fficers cannot lawfully pursue unrelated investigations after quickly completing the mission by claiming that the overall duration of the stop remained reasonable, nor by waiting to resolve the mission (such as by writing a ticket or giving a verbal warning) until unrelated inquiries are completed." *Id.* ¶ 20. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354. Beyond the reason for the initial stop, ordinary inquiries related to a traffic stop include checking the validity of the driver's license, running a warrant check on the driver, and checking the driver's registration and insurance. *Bass*, 2021 IL 125434, ¶ 16. Ordinary inquiries may include those that serve officer safety as well as traffic enforcement. *People v. Cummings*, 2016 IL 115769, ¶ 14. "Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself. Traffic stops are 'especially fraught with danger to police officers,'[*Arizona v. Johnson*, 555 U.S. 323, 330 (2009)] (internal quotation marks omitted), so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 575 U.S. at 356. "The Supreme Court has made plain that an officer's inquiries into matters unrelated to the justification of the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Bass*, 2021 IL 125434, ¶ 18 (quoting *Johnson*, 555 U.S. at 333).

- 20 -

¶ 63        "Determination of whether a traffic stop was unduly prolonged requires an analysis of a totality of the circumstances." *Reedy*, 2015 IL App (3d) 130955, ¶ 27; see also *People v. Baldwin*, 388 Ill. App. 3d 1028, 1034 (2009). "Among the circumstances considered are the brevity of the stop and whether the police acted diligently during the stop." *Reedy*, 2015 IL App (3d) 130955, ¶ 27.

¶ 64        Defendant argues the stop was extended during four periods of time: (1) when Gray was initially asking defendant questions; (2) when Gray returned to his vehicle to write the written warning for a lane infraction; (3) when Gray returned to defendant's vehicle and asked him to step out; and (4) when defendant was seated in Gray's vehicle.

¶ 65                                a. Initial Approach

¶ 66        Defendant first argues Trooper Gray's questions about why defendant was traveling to Springfield and what high school he went to "measurably" extended the stop because the questions had nothing to do with the mission of the stop. We disagree. A few indirect questions confirming defendant's destination do not convert the encounter into an unlawful seizure. See *Rodriguez*, 575 U.S. at 356.

¶ 67                                b. Return to Patrol Vehicle

¶ 68        Defendant next argues Gray impermissibly extended the stop when he returned to his vehicle and called Trooper Lankford. The trial court found Gray was working on the written warning while conversing with Lankford. We see nothing in the record to find the trial court's determination to be against the manifest weight of the evidence. Gray finished defendant's written warning in less than seven minutes. Defendant did not dispute Gray's testimony such a written warning could take up to 15 minutes to complete. Therefore, the logical conclusion is that Gray worked diligently to complete defendant's written warning while speaking with

Lankford. Similarly, in the time after the phone call, which defendant describes as "an unexplained four minutes," Gray continued to work diligently to complete the written warning. We find nothing in the record to dispute the court's determination that Gray used the time in his vehicle to write the written warning, and therefore, Gray's actions did not impermissibly extend the length of the stop.

¶ 69        Defendant further argues Gray "could have" checked defendant's insurance card immediately upon receipt or immediately returned to defendant's car and questioned defendant concerning the insurance card as soon as he noticed it had expired. If Gray had done so, defendant contends, he could have written both the written warning for defendant's lane violation and the ticket for no insurance simultaneously, thus shortening the length of the traffic stop. Defendant is correct that officers must pursue their traffic stop investigation "diligently." See *Sadeq*, 2018 IL App (4th) 160105, ¶ 76. However, defendant does not cite any authority, and we can find none, that diligence in pursuing the mission of the stop requires an officer to perform his duties with no inefficiencies, however slight. In hindsight, perhaps Gray could have discovered defendant's insurance card had expired at an earlier point in the traffic stop and written both the ticket for no insurance and the written warning for crossing the fog line at the same time. Defendant's argument is speculative. We do not hold officers to a standard of clairvoyance, but a standard of diligence. *Reedy*, 2015 IL App (3d) 130955, ¶ 27. Gray diligently completed the task at hand and, after discovering the expired insurance card, returned to defendant's vehicle to determine whether defendant had a valid insurance card available.

¶ 70                                c. Return to Defendant's Vehicle

¶ 71        Defendant's contention that he was improperly subjected to a pat-down search has little impact on the decisions before us. The propriety of the pat-down search itself is not at issue;

defendant consented to it. Defendant's only possible argument here is that the pat-down search measurably extended the length of the stop. See *Bass*, 2021 IL 125434, ¶ 18 ("[A]n officer's inquiries into matters unrelated to the justification of the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). The pat-down search took a matter of seconds and did not detract from Gray's diligent completion of the mission of the stop. See *Reedy*, 2015 IL App (3d) 130955, ¶ 27; see also *Rodriguez*, 575 U.S. at 356 ("[A]n officer may need to take certain negligibly burdensome precautions in order to complete his mission safely.").

¶ 72                          d. Discussion in Gray's Vehicle

¶ 73          Defendant next argues the five minutes Gray spent "asking all manner of questions" of defendant measurably extended the traffic stop. As defendant sat in Gray's vehicle, Gray asked defendant about his insurance card, discussed with him the importance of carrying his valid card, and explained the requirement that he write defendant a ticket for no insurance. The trial court determined, at that point, Gray began diligently working on defendant's ticket for no insurance. The trial court noted that it was able to "hear [Gray] typing at 13:07 on the dashcam video and at 13:31 he indicates he is working on something." Although the recording's poor quality makes it difficult to discern the sounds in it, there is certainly a sound that could be heard as fingers tapping on a keyboard. The court considered Gray's statement that he was working on something, as well as Gray's initial testimony during the preliminary hearing, as recited by defense counsel during cross-examination, in which Gray stated, "I began writing [defendant] the ticket waiting on the canine officer." Based on the totality of circumstances, the court concluded Gray was diligently working on the no insurance ticket while engaging in casual conversation with defendant, a finding not against the manifest weight of the evidence. Thus, we

do not find the discussion measurably extended the length of the traffic stop beyond the mission. See *Bass*, 2021 IL 125434, ¶ 18.

¶ 74                                    e. Totality of the Circumstances

¶ 75          When reviewing a motion to suppress, this court uses a totality of the circumstances analysis. *Reedy*, 2015 IL App (3d) 130955, ¶ 27. After considering each of defendant's claimed delays, we find the traffic stop, which took a total of only approximately 15 minutes from the initial stop until the canine alerted, and during which Gray was diligently pursuing the missions of the stop, was not measurably prolonged. Accordingly, the trial court properly denied defendant's motion to suppress.

¶ 76                                    3. *Continued Detention*

¶ 77          As we have already determined the traffic stop was not "prolonged beyond the time reasonably required to complete its mission and attend to related safety concerns" (*Bass*, 2021 IL 125434, ¶ 16), we need not determine whether Gray had a reasonable suspicion of other criminal activity. See *Rodriguez*, 575 U.S. at 355 (holding an officer may not prolong a traffic stop without "the reasonable suspicion ordinarily demanded to justify detaining an individual").

¶ 78                                    B. Sentencing

¶ 79          The trial court has broad discretion in imposing a sentence. *People v. Jones*, 168 Ill. 2d 367, 373 (1995). There is a strong presumption the trial court based its sentencing determination on proper legal reasoning, and the trial court's sentencing decision is reviewed with great deference. *People v. Dowding*, 388 Ill. App. 3d 936, 942-43 (2009). However, the question of whether the court relied on an improper factor in imposing a sentence ultimately presents a question of law to be reviewed *de novo*. *People v. Chaney*, 379 Ill. App. 3d 524, 527 (2008). The burden is on the defendant to affirmatively establish that the sentence was based on

improper considerations. *People v. Conley*, 118 Ill. App. 3d 122, 133 (1983). "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *Dowding*, 388 Ill. App. 3d at 943.

¶ 80                                      1. *Criminal History*

¶ 81        Defendant argues the trial court erred by speculating that defendant's 2005 deferred judgment for money laundering in Texas was related to transporting controlled substances. Defendant contends the facts of the Texas case were not before the court, and therefore any connection the court found between the Texas case and the present case, and the court's conclusion defendant had spent "13 years *** running drugs and money," were in error.

¶ 82        A trial court has "wide discretion in the sources and types of evidence" it may consider during sentencing. (Internal quotation marks omitted.) *People v. Foster*, 119 Ill. 2d 69, 96 (1987); *People v. Eddmonds*, 101 Ill. 2d 44, 65 (1984); *People v. Adkins*, 41 Ill. 2d 297, 300 (1968). "The only requirement for admission [of evidence] is that the evidence be reliable and relevant [citations] as determined by the trial court within its sound discretion." *Foster*, 119 Ill. 2d at 96. Moreover, the court is allowed to make reasonable inferences from the evidence when sentencing a defendant. *People v. Chapman*, 194 Ill. 2d 186, 253 (2000); *People v. Alexander*, 127 Ill. App. 3d 1007, 1018 (1984).

¶ 83        Here, we find the trial court did not err during sentencing when it made a reasonable inference that this was not defendant's first time transporting drugs. The court properly considered all the evidence, not just defendant's deferred prosecution in the 2005 Texas case. The court characterized the Texas case as "a little suspicious," and found the record as a whole created a reasonable inference that defendant's job was "[r]unning money and drugs

- 25 -

across the county." We note that during the sentencing hearing, defense counsel argued defendant was merely "a mule." A mule is a slang term for "a person who smuggles or delivers illicit substances." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/mule (last accessed Sept. 3, 2022). Defendant's lack of a visible means of support, the large quantity of cocaine at issue in this case, as well as defendant's previous deferred judgment for money laundering in a state in which he did not live or work, together created a reasonable inference defendant had long been involved in this criminal enterprise and was at least, in the words of defense counsel, a "mule." Thus, we find the court did not err making this reasonable inference based on all the evidence. See *Chapman*, 194 Ill. 2d at 253.

¶ 84                                    2. *Factor Inherent in the Offense*

¶ 85            Defendant next argues the trial court erred by considering a factor inherent in the offense, namely, the general societal harm associated with trafficking controlled substances.

¶ 86            In determining an appropriate sentence, the trial court may consider the seriousness, nature, and circumstances of the offense, including the nature and extent of the elements of the offense. *People v. Saldivar*, 113 Ill. 2d 256, 271-72 (1986). However, "it is well established that a factor inherent in the offense should not be considered as a factor in aggravation at sentencing." *Dowding*, 388 Ill. App. 3d at 942. The prohibition against consideration of a factor inherent in the offense " 'is based on the assumption that, in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense.' " *McGath*, 2017 IL App (4th) 150608, ¶ 64 (quoting *People v. Phelps*, 211 Ill. 2d 1, 12 (2004)).

¶ 87            The issue here is that, in announcing its sentencing decision, the trial court referred to factors which may be viewed as inherent in the offense of unlawful possession with

intent to deliver cocaine, such as the harm the introduction of drugs causes to a community. In *People v. McCain,* the appellate court held that "[i]t is not improper *per se* for a sentencing court to refer to the significant harm inflicted upon society by drug trafficking." *People v. McCain*, 248 Ill. App. 3d 844, 852 (1993). *McCain* presented a somewhat unusual case, in that the defendant there pleaded guilty to "possessing substantially less cocaine than was actually involved in [that] case and agreed to allow the actual amount to be argued as a factor in aggravation." *McCain*, 248 Ill. App. 3d at 853. Normally, one might presume that, where statute establishes a penalty range corresponding to a range of possession amounts, the legislature has already considered the societal harm of an offense. The wrinkle in *McCain* was that the defendant pleaded guilty to possessing with intent to deliver 15-100 grams of cocaine, but the parties stipulated that the amount he actually possessed was 931.8 grams. See *McCain*, 248 Ill. App. 3d at 845-846.

¶ 88          The situation in *McCain* is somewhat analogous to this case, where the amount possessed by defendant was more than twice the highest possession amount addressed by the statute, 900 grams. The trial court's comments at issue were centered on the very large amount of cocaine in defendant's possession and the potential harm it might cause in the community. We do not believe it is error for a trial court to mention and consider at sentencing the degree to which the facts of the case exceed a statutory minimum or maximum. See, *e.g.*, *People v. Raney,* 2014 IL App (4th) 130551 ¶ 37 (stating that where an element of the offense was that the victim was aged 60 or older, it was not error for the court to note that the victim was much older than 60); *People v. King*, 151 Ill. App. 3d 662, 663 (1987) (stating that it was not error for the trial judge to consider the extreme youth of the victim as an aggravating factor in sentencing for the offense of cruelty to children).

¶ 89	We also note that "factors inherent in the offense can sometimes be considered, along with other factors in aggravation and mitigation, as part of the nature and circumstances of the case. [Citations.] Thus, a trial court may discuss the impact a drug offense has on the community without subjecting the defendant to double enhancement." *McGath*, 2017 IL App (4th) 150608, ¶ 73. However, as cautioned in *McCain*, courts are encouraged to "segregate such general commentary from the balancing of sentencing factors." *McCain,* 248 Ill. App. 3d at 852. The trial court here failed to do so, which makes our review more difficult. Though the trial court noted that it was "very well aware not to double enhance," it is more challenging to credit such a statement when it is blended with the weighing of the sentencing factors.

¶ 90	While a trial court's comments at the time of sentencing are likely to give more immediate insight into what matters were considered, we can also consider the court's comments at the motion to reconsider sentence. See, *e.g.*, *McCain*, 248 Ill. App. 3d at 853. At the hearing on the motion to reconsider sentence, the trial court here explained, "[T]his is a very serious matter. I did not consider [the harm to the community] as a statutory aggravating factor, but it is certainly something that the Court is mindful of and should be mindful of." The court further explained the reasoning behind the sentence it imposed and that harm to the community was a relevant consideration. We find that these comments expanded on and were consistent with the comments made at the time of sentencing.

¶ 91	We find the court did not err in commenting on the harm to the community caused by defendant transporting two kilograms of cocaine.

¶ 92	                    III. CONCLUSION

¶ 93	For the reasons stated, we affirm the trial court's judgment.

¶ 94	Affirmed.